UNITED STATES of America,
Plaintiff,

v.

LOCAL NO. 86, INTERNATIONAL AS-
SOCIATION OF BRIDGE, STRUCTUR-
AL, ORNAMENTAL AND REINFORC-
ING IRONWORKERS, et al., Defend-
ants.

Civ. A. No. 8618.

United States District Court,
W. D. Washington, N. D.

June 5, 1970.

Supplemental Orders June 16, 1970.

Stan Pitkin, U. S. Atty., Patrick J. King, Robert T. Moore, Andrew J. Barrick, Gerald F. George, Frank Petramalo, Jr. and Joel L. Selig, Attys., Civil Rights Division, Dept. of Justice, Washington, D. C., for plaintiff.

Hugh Hafer, and John E. Rinehart, Seattle, Wash., for all defendants except Ironworkers Joint Apprenticeship Committee, Local 86.

Alec Brindle, Seattle, Wash., for Ironworkers Joint Apprenticeship Committee, Local 86.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

LINDBERG, Chief Judge.

This cause having regularly come on for trial commencing on February 17,

1970, upon plaintiff's claim against defendant Ironworkers Local 86, Ironworkers Joint Apprenticeship and Training Committee, Sheet Metal Workers Local 99, Sheet Metal Joint Apprenticeship and Training Committee, Plumbers and Pipefitters Local 32, Plumbers and Pipefitters Joint Apprenticeship and Training Committee, and Electricians Local 46, and counsel for the plaintiff and each of these defendants having appeared and the Court having heard the evidence, the argument of counsel, examined the exhibits, read the transcript of proceedings, and considered the briefs submitted by counsel, now makes the following:

## I

FINDINGS OF FACT APPLICABLE TO LOCAL 86, INTERNATIONAL ASSOCIATION OF BRIDGE, STRUCTURAL, ORNAMENTAL, AND REINFORCING IRON-WORKERS

1. Local Union No. 86 of the International Association of Bridge, Structural, and Ornamental Ironworkers (hereinafter Local 86) is a labor organization representing workmen in the ironwork trade. Its geographical jurisdiction includes King, Kittitas, Jefferson, Kitsap, and Yakima Counties; the south half of Clallam, Snohomish, Chelan and Island Counties and all projects spanning the Columbia River from Okanogan County to Benton County, all in the State of Washington. Its principal place of business is at 2800 First Avenue, Seattle. (Admitted Facts, par. 1)

2. Local 86 is party to a collective bargaining agreement with ironwork contractors represented by the Seattle Northwest, Tacoma, and Mountain Pacific Chapters of the Associated General Contractors of America, Inc. The agreement is in effect through July 20, 1971. (Admitted Facts, par. 5)

3. Local 86 has an exclusive hiring hall for contractors with whom it has collective bargaining agreements. The employer must call the union in order to obtain men; he can obtain men from other sources only if the union is unable to fill his request for men within 48 hours. (Pl. Ex. 39, pp. 5–6)

4. Through its hiring hall Local 86 controls at least 90 percent of the employment opportunities in the building construction classifications of the ironwork trade in the Seattle and Western Washington area within its geographical jurisdiction. (Admitted Facts, par. 7)

5. In January 1970 Local 86 had approximately 920 members. (Pl. Ex. 1; Pl. Ex. 246, p. 60; Pl. Ex. 245, p. 46) Local 86 has only one black journeyman member, Howard Lewis, who was admitted on September 12, 1969, pursuant to an order of the Washington State Board Against Discrimination. (Admitted Facts, par. 3, 4; Facts Not To Be Contested) Local 86 also has two black apprentices; John Ingram, who was admitted on October 10, 1969, and Early Johnson, who was first dispatched on October 3, 1969. (Admitted Facts, par. 3, 4)

6. In the operation of its hiring hall Local 86 maintains an out of work list for workmen seeking referral. (Pl. Ex. 246, p. 11) Local 86 uses the following standards and procedures in the operation of the hiring hall:

a. Workmen who register for referral to jobs in the trade are given priority in the following order (Admitted Facts, par. 10):

*A List:* Members of Local 86 who have worked at least three years in the ironwork trade within the geographical jurisdiction of Local 86 (blue cards);

*B List:* Members of Local 86 or any other "outside" Ironworkers Local who have worked more than nine months in the ironwork trade within the geographical jurisdiction of Local 86 (green cards). An "outside" Ironworkers Local is a local union of the ironworkers which represents workmen in the building construction classification of the ironwork trade;

*C List:* Members of Local 86 or any other "outside" ironworkers local who

have worked less than nine months in the ironwork trade within the geographical jurisdiction of Local 86 (white cards);

*D List:* Workmen not members of Local 86 or any other "outside" ironworkers local union (pink cards).

b. The hiring hall operates from 7:00 to 10:00 a. m. (Admitted Facts, par. 10)

c. When employers request workmen from Local 86, hiring hall union personnel offer the jobs to those workmen present in the hiring hall, first, by calling out the name of the contractor and the job location, and, second, by calling the names of the workmen who have registered for referral, in priority order. When the name of a workman who is present in the hall is called, he may claim the job or decline it. (Admitted Facts, par. 10) There are two general exceptions to the foregoing procedures:

(1) When an employer requests a particular workman by name, the hiring hall will fill the request if the man has worked for that employer for six months out of the previous twelve months. (Admitted Facts, par. 10)

(2) When an employer requests a particular workman by name to act as a supervisor the hiring hall will fill the request regardless of the man's priority standing at the time. (Admitted Facts, par. 10)

In addition to the two general exceptions above, union officials will also occasionally refer men to jobs without going through the normal referral procedure. (Tr. 125)

7. There are three principal classifications of ironworkers: structural ironworkers; rodmen; and welders. Structural men erect and assemble steel beams and like components used in the construction of buildings and bridges. Rodmen (also known as rodbusters) work in the area of reinforcing concrete with steel bars and mats. Welders are responsible for welding various types of heavy gauge metals. (Tr. 24, 25, 112, 1215) Apprentices, irrespective of union member-

ship, are dispatched on a ratio basis in accordance with the number of journeymen required on a given job. Their dispatch system is separate and independent from that of the other men on the out of work list. (Admitted Facts, par. 11)

8. The applicable standards for membership set out in Local 86's constitution are anyone "versed in the duties of some branch of the trade \* \* \*, of good moral character and competent to demand standard wages." (Pl. Ex. 37, p. 5)

9. An individual may become a member of Local 86 in one of three ways: (a) direct admission to membership; (b) by transferring from a sister ironworkers local; and (c) by completion of the Local's apprenticeship program. (Tr. 1478; Pl. Ex. 37, pp. 70, 84)

10. Persons seeking membership in Local 86 must have two sponsors who are members of Local 86 and who have been in good standing in Local 86 for two years. (Admitted Facts, par. 17)

11. Howard Lewis and Jettie Murray were and are experienced black welders of journeyman capability who sought referral by and membership in Local 86. On the basis of the following facts, the Court finds that both men were denied referral and membership by Local 86 on account of their race:

a. In 1962 Lewis obtained an application for membership in Local 86 but did not submit it as he was unable to find any union members who would vouch for him by signing his application. (Tr. 30–31)

b. In 1966 Lewis made three attempts to join Local 86. On the first occasion he was given a June 1966 date for his examination. Lewis took time off from work and traveled approximately 175 miles to come to Seattle for the examination. However, he was not examined because he did not bring a withdrawal card to show that he no longer belonged to another union. Lewis appeared again in July of 1966. He gave the Board his City of Seattle Welder's Certificate and other welder's certificate papers, his

withdrawal card from another union and a letter of recommendation from his superintendent. He was then asked how well he could tie knots. Lewis replied that he was not very good at tying knots. He was then informed that he could not become a member of the Union unless he knew how to tie knots. Thereafter, Lewis learned how to tie knots and in September 1966 returned a third time to Seattle from his job site some 175 miles outside of the city. At that time he was given a knot tying test. He was able to tie the first seven knots. He was then asked to tie a knot that he had never heard of before and when he told the Examining Committee that he did not know how to tie the knot, he was informed that he had failed the examination and could not become a member. The knot tying test was used as a device to exclude Lewis. Lewis decided against trying a fourth time. Shortly after his third attempt, Lewis was laid off from his ironworkers job. Upon numerous occasions after that, the Union refused to refer Lewis to employment on the ground that he was not unemployed. In March 1967, Lewis filed a complaint with the State Board Against Discrimination charging Local 86 with racial discrimination. Subsequently, Lewis was referred to jobs by Local 86 but the jobs were always of short duration. As a result of this treatment, Lewis stopped seeking referrals for employment by Local 86. On March 12, 1969, the Washington State Board Against Discrimination found that Local 86 had discriminated against Lewis on account of his race. The Board ordered Local 86 to accept Lewis as a member. Pursuant to the State Board's court order, Local 86 took Lewis into membership in September of 1969. (Tr. 22–50; Pl. Ex. 40; Facts Not To Be Contested)

c. In May 1966, Jettie Murray applied at Local 86 for referral as a welder after having been advised that there was a need for welders in the ironworkers trade. He applied to the union on a regular basis for approximately three months but was always told that there was no work. On one occasion Murray contacted an ironworker employer directly about work, and upon instructions went to the union hall for dispatch back to the employer as per the collective bargaining agreement. William O. McGregor, Business Manager of Local 86, refused to dispatch him to the job. On another occasion, in June 1966, Murray presented his city welders certificate to McGregor. McGregor told Murray that he was not a welder and returned his city certificate to him. Murray never returned to the union hall. (Pl. Ex. 238, pp. 20–26) When Murray was seeking referral in May 1966 there was a shortage of welders which was so serious that one of the ironwork contractors sent a letter to the International Union requesting all types of ironworkers, including welders, after it was unable to obtain enough welders through Local 86. (Admitted Facts, par. 18) On June 3, 1966, Mr. Murray filed a complaint with the Washington State Board Against Discrimination. (Pl. Ex. 40, p. 1) In May 1967 he was notified to appear to take a membership test, and appeared before Local 86's Examining Board. He was asked to tie knots and to thread blocks. He told them that he wanted a welder's book and knew nothing about tying knots or threading blocks. He was then told that he had failed, and that he should go home, study knots and return at a later time. He was asked no questions concerning his welding abilities. (Pl. Ex. 238, pp. 32–34) Murray did not return to attempt to pass the test a second time. In the decision of the Washington State Board Against Discrimination of March 12, 1969, that tribunal found that Local 86 had discriminated against Murray on account of his race. (Pl. Ex. 40)

12. In the past, Local 86, in the operation of its hiring hall, frequently dispatched for employment D list applicants in cases where A, B, and C list workmen were either absent from the hiring hall or declined the opportunity to accept a dispatch. (Admitted Facts, par. 12) In the summer of 1969, Local 86 at the direction of its International accepted into

membership 35 of its Group D workmen (known as "permit men"). It also adopted a policy of limiting referrals to union members. (Admitted Facts, par. 13; Pl. Ex. 246, pp. 54, 60)

13. On the basis of the following facts, the Court finds that in the summer of 1969 Local 86 offered referral and membership to whites who sought employment while at the same time denying referral and membership to Cornelius Bradford and William Bracy, black applicants, on the same basis:

a. Prior to 1968 Local 86 did not require written examinations for journeyman membership. (Admitted Facts, par. 19) Commencing about March 1968, Local 86 has required workmen to take and pass a written examination prepared by the International Union in order to become eligible for membership. However, in June 1969 the International Union issued journeyman membership books to 35 workmen and the International Union assisted the workmen in completing the necessary application forms. These men did not pass the Local's test or complete its apprenticeship program. None of these men were blacks. (Admitted Facts, par. 13) Ten of these 35 men had previously taken and failed Local 86's examination, but were nevertheless admitted as journeyman members of Local 86. (Admitted Facts, par. 15, 16) The 35 men did not have to meet any minimum experience requirements. One of them, Walter Hall, had only six weeks experience in the trade at the time he was offered membership. (Pl. Ex. 89, pp. 2, 7) Another, Ray Wallace, had approximately nine weeks experience when he was offered membership. (Pl. Ex. 88, pp. 2, 5)

b. Later in the summer of 1969, two whites who had been cleared as permit men in the past—Rene Comeaux and Clifford Moon—were told by Local 86 that they would be referred out to work on payment of $150 and $300 respectively. Comeaux was told to fill out apprentice papers and pay $150 in the beginning part of August; in July Moon asked to work on permit and was told that if he paid $300 he would be given a book and become a member of the union. (Pl. Ex. 287, pp. 5–7, 10–11; Tr. 125–128, 114)

c. In June of 1969, at or about the time the 35 permit men were taken into the union and before Comeaux and Moon were offered referral and membership, two experienced black welders who had applied for referral—Cornelius Bradford and William Bracy—had their names on the Group D out of work list but were not offered membership or referral. (Pl. Ex. 239, pp. 7, 9, 12, 22, 24, 26–27, 30; Tr. 92–95; Admitted Facts, par. 10(a))

14. Based on the following facts the Court finds that Local 86, on a continuous basis, has denied blacks the use of its hiring hall and has given them false information concerning employment conditions:

a. A condition precedent to referral to an employer through Local 86's hiring hall is having one's name placed on the out of work list. (Pl. Ex. 246, p. 44; Admitted Facts, par. 10) Experienced black welders contacted Local 86's hiring hall on numerous occasions between 1965 and 1969 and were not furnished with any information concerning the operation of the hiring hall nor permitted to have their names placed on the out of work list. (Tr. 83–86; Pl. Ex. 239, pp. 23–24; Pl. Ex. 242, pp. 40–41, Tr. 84; Pl. Ex. 240, pp. 19–21; Pl. Ex. 241, pp. 38–40; Pl. Ex. 238, pp. 22–23)

b. Experienced black welders seeking referral through Local 86 between 1965 and 1969 were told that no work was available. (Pl. Ex. 238, pp. 22–23; Pl. Ex. 243, pp. 16–18; Tr. 83–86; Tr. 92–95; Pl. Ex. 246, pp. 47–48; Pl. Ex. 239, pp. 23–24, 26–27; Pl. Ex. 242, pp. 40–41; Tr. 84; Pl. Ex. 240, pp. 19–21; Pl. Ex. 241, pp. 38–40)

c. Employment conditions in the ironwork trade within Local 86's jurisdiction were in fact very good from 1965 through the latter part of 1969. This fact is reflected in a steady and substantial increase in the Local's membership during said period. (Pl. Ex. 5; 10; 11; 304; 303; 1; Pl. Ex. 246, p. 60)

d. In the spring of 1966 Jettie Murray sought referral at Local 86 and was told by the Business Manager, Mr. McGregor, that he had not had a call for a welder for two months. (Pl. Ex. 238, pp. 20–22) In fact Local 86 at that time was unable to furnish a sufficient number of welders to its contractors, with the result that in May 1966 one contractor wrote the International Union requesting welders. (Admitted Facts, par. 18) Odell Gilbreath was told there was no work available in late 1967. (Pl. Ex. 240, pp. 19–20) Melvin Harris was told the same thing in September 1967. (Pl. Ex. 241, pp. 39–40) Local 86's General Membership Minutes indicate that in fact work was excellent during the last quarter of 1967. (Pl. Ex. 12, 13, 14) In October 1967, for example, 1,400 men were employed in the jurisdiction, which was 550 men over Local 86's membership at that time. (Pl. Ex. 11, 13)

15. The following facts in conjunction with findings 13 and 14, above, indicate that whites with little or no ironwork experience have been referred by Local 86, taught their skills on the job, and offered journeyman membership without having to serve an apprenticeship, while blacks have been denied these opportunities on an equal basis:

a. The bulk of the work which a rodman does consists in the placing and tying of rods on reinforcing jobs. The evidence establishes that the skills ordinarily required of a rodman can be learned and developed on the job in considerably less time that the two year minimum contended for by the union. (Tr. 113, 120; Pl. Ex. 285, p. 5; Pl. Ex. 244, pp. 6–7; Pl. Ex. 286, pp. 10–11, 30–31; Pl. Ex. 287, p. 4; Tr. 1514–15)

b. Whites, some with little or no previous ironwork experience are able to obtain referral by and membership in Local 86 without going through any apprenticeship program: Walter B. Hall (Pl. Ex. 89); Ray Wallace (Tr. 118–121; Pl. Ex. 88); Rene Comeaux (Tr. 125);

Clifford Moon (Tr. 113–14); Glenn Anderson (Pl. Ex. 244, pp. 3–4).

c. Although blacks are permitted to have their names placed on the group D out of work list, no group D men have been referred out since early 1969. This has had the practical effect that no black journeyman has been referred other than Howard Lewis, who was initiated as a member pursuant to the ruling of the Washington State Board Against Discrimination. (Pl. Ex. 246, pp. 44–46; Tr. 114, 127–28; Facts Not To Be Contested)

16. On March 2, 1970, Local 86 implemented certain changes in its hiring hall procedures as a result of a decree from the Ninth Circuit Court of Appeals. (Dft. Ex. B–3; Tr. 1469–71) The procedures adopted have not yet been approved by the National Labor Relations Board. (Tr. 1478–81)

Based on the foregoing Findings of Fact regarding Ironworkers Local 86 the Court makes the following:

CONCLUSIONS OF LAW

1. Local 86 is a labor organization within the meaning of 42 U.S.C. § 2000e (d) and is engaged in an industry affecting commerce within the meaning of 42 U.S.C. § 2000e(e).

2. The Court has jurisdiction over the subject matter of this action and the parties to it by virtue of Title VII of the Civil Rights Act of 1964. 42 U.S.C. § 2000e et seq. The Attorney General is authorized under § 707(a) of that Act to institute suit to enjoin a pattern or practice of discrimination and request such relief as may be necessary to insure the full enjoyment of rights described in Title VII. 42 U.S.C. § 2000e–6(a).

3. Defendant Local 86 has pursued a pattern and practice of conduct which has denied blacks, on account of their race or color, equal employment opportunities in the construction industry.

## II

### FINDINGS OF FACT APPLICABLE TO THE IRONWORKERS JOINT APPRENTICESHIP COMMITTEE

1. The J.A.C. is an unincorporated body composed of eight members, of whom four are representatives of Ironworkers Local No. 86 and four are representatives of contractors party to a collective bargaining agreement with Local No. 86. (Admitted Facts, par. 2)

2. The J.A.C. administers and controls the apprenticeship program in the ironwork industry within the jurisdiction of Local 86 and determines which persons shall be admitted to this program. (Admitted Facts, par. 3)

3. There are currently 49 apprentices indentured in the ironwork apprenticeship program, of whom two are black: John Ingram was indentured in November 1969 and Early Johnson was indentured in December 1969. Ingram was first dispatched for employment in July 1969, and Johnson in October 1969. (Admitted Facts, par. 4) These two blacks are the only ones who have participated in the program since April 1967 (Tr. 235; Pl. Ex. 34), and so far as the record reflects, they are the only ones ever to be in the program. (Tr. 235, 240–41)

4. Between June 20, 1968 and January 9, 1970, 19 blacks have applied to the program. (Admitted Facts, par. 13; Pl. Ex. 23, 32) The applications of these 19 blacks were taken after A. A. Scales, Business Representative of Local 86 and Secretary of the J.A.C., pledged the J.A.C. to a policy of non-discrimination. This pledge was in the form of a letter sent in connection with two charges of racial discrimination by the union pending before the Washington State Board Against Discrimination. (Pl. Ex. 36) of the 19 black applicants, only two were accepted. (Admitted Facts, par. 14)

5. The following facts indicate one of the procedures by which the defendant J.A.C. has discouraged or attempted to discourage blacks from undertaking and/or pursuing their applications.

a. Mr. A. Sonn has been coordinator of the J.A.C. since April 1967. Prior to that time, there was no full-time apprentice coordinator. (Admitted Facts, par. 13) Applicants normally fill out their applications in Mr. Sonn's presence, and Mr. Sonn's duties include briefing applicants to the program. (Tr. 150, 193) Mr. Sonn testified that on occasion he has told black applicants that they would be "Jackie Robinsons." (Tr. 1206)

b. Gregory Buford, a black, visited the Ironworkers J.A.C. office in 1968 and began filling out an application. (Pl. Ex. 21) Before or as Buford filled out his application, Mr. Sonn (Tr. 245) told Buford in effect that ironwork was a good field of work, but that he did not know if blacks could handle it. Subsequent to this remark Buford crumpled his application, threw it in the wastebasket, and left the office, feeling that he had no chance of getting into the program. (Tr. 181–84) He did not pursue his application further. (Tr. 183–84)

c. William Collins, a black, applied to the apprentice program on April 22, 1969. (Pl. Ex. 20) He had been referred to Mr. Sonn by the Washington State Employment Service. (Pl. Ex. 23 (1)) Mr. Sonn (Tr. 1222) told Collins that if he passed his aptitude test he would have to go before a Board. He then stated in effect that the Board would give Collins a hard time because he was black. (Tr. 178) Collins did not pursue his application any further. (Tr. 179)

6. Applicants to the ironworkers apprentice program are interviewed by the J.A.C. and are awarded up to 100 points. According to the J.A.C.'s published standards, applicants receiving over 70 percent are then placed on a waiting list and called for work in chronological order. Thirty percent of the maximum number of points an applicant can receive is based on the interview; 10 percent is based on past experience in the trade; 10 percent is based on references; 15 percent is based on education; 10 percent is based on the physical exam; 15 percent is based on test scores; 5

percent is based on residence (Geographic Jurisdiction of J.A.C.); and 5 percent is based on Military Service. (Admitted Facts, par. 8)

7. Fifty percent of the points which can be awarded under this system—10 percent for past experience, 10 percent for references, and 30 percent for oral interview—are based on subjective, non-reviewable determinations by the J.A.C. for which there are no set standards. (Tr. 225–227)

8. Prior to November 1968, sons, and relatives of union members were given an automatic five point preference under J.A.C. standards. (Admitted Facts, par. 8)

9. It is the practice of the apprentice coordinator to review applications after they have been filled out and to question the applicant concerning any ambiguities in the information he has supplied. (Tr. 143, 151) The Court finds that the apprenticeship coordinator did not follow the practice with respect to blacks, as evidenced by the treatment of Errin Webb's application. (Pl. Ex. 22; Admitted Facts, par. 15; Tr. 152, 270)

10. It is the policy of the apprentice coordinator to advise persons who are disqualified because of their age of their disqualification, and not to refer them to take an aptitude test. (Tr. 143) James Cherry, a black applicant, took an aptitude test which was administered and scored personally by Mr. Sonn, the apprentice coordinator. (Pl. Exs. 23q, 25; Tr. 1228, 1230–31) The J.A.C. then sent Mr. Cherry a letter indicating that he was rejected because he had failed the test and was over-age. (Pl. Ex. 23q; Tr. 249; Admitted Facts, par. 16) The Apprentice Standards state that applicants should be between the ages of 18 and 30. (Pl. Ex. 31) Mr. Cherry was 30 when he took the aptitude test. (Pl. Ex. 23q, 30f) The Court finds that had Mr. Cherry in fact been over-age at the time of his application, the apprentice coordinator would have advised him that he was not qualified for the program, and he would not have been told to take the aptitude test. (Tr. 143) Mr. Cherry's scores on the aptitude test were 1 verbal, 24 composite. (Admitted Facts, par. 16) Under current published standards, in effect at the time Cherry took the test, his score of 24 composite was a passing score and his score of 1 verbal was not a passing score. (Pl. Ex. 27; Tr. 206) Four applicants whose scores were not passing under current published standards were accepted between August 1967 and May 1968, and two such applicants were accepted since current published standards were established. Four of these six applicants scored 1 on the verbal section of the test. (Admitted Facts, par. 11, 12)

11. Based upon the facts contained in paragraphs 12–19 below, it is reasonable to infer and the Court finds that the aptitude test requirements of the Ironworkers J.A.C. are untested, inadequate and discriminatory as to blacks.

12. Prior to the summer of 1967, applicants to the Ironworkers apprentice program were not required to take any aptitude test. (Tr. 143–44; 205)

13. Since July or August 1967, applicants have been required to take the Flanagan aptitude test. (Tr. 205)

14. Prior to May 23, 1968, no minimum qualifying scores on the aptitude test had been established by the J.A.C. Since that date, the J.A.C.'s published qualifying scores have been 3 on the verbal section of the test and 24 on a composite of six other sections of the test. (Admitted Facts, par. 10; Pl. Ex. 27; Tr. 206)

15. The minimum qualifying scores of 3–24 were established by the J.A.C. less than one month after A. A. Scales, Business Representative of Local 86 and Secretary of the J.A.C., wrote a letter to the General Counsel of the Washington State Board Against Discrimination in connection with two charges of racial discrimination by Local 86 pending before the Board. In this letter Scales pledged the union and the J.A.C. to a policy of non-discrimination and promised to take steps to recruit applicants of all races. The letter was written on

April 26, 1968; the minimum qualifying scores were established on May 23, 1968. (Pl. Ex. 27, 36)

16. Since the minimum qualifying scores were established by the J.A.C., approximately 27 percent of the blacks taking the test have passed, while approximately 72 percent of the others taking the test have passed. (See table in Plaintiff's Post-Trial Brief, derived from Admitted Facts, par. 13, 16, 17; Pl. Ex. 19, 23q, 24, 30, 32, 33; Tr. 240–41)

17. Since August 1967, the aptitude tests have been administered at Seattle Community College. (Admitted Facts, par. 9) However, there have been occasions on which the test has been administered and scored by the apprentice coordinator, an agent of the defendant J.A.C., both at the college and at the J.A.C. office. (Tr. 274–75; 157–58; 1231) The files at the testing office of the College do not contain records of the test results of all persons who have taken the test. (Pl. Ex. 19, 23q, 24, 30f, 25) A single sheet of paper was found in the college files which contained the test results of James Cherry, a black applicant, and two other applicants whose tests were scored by Mr. Sonn; this piece of paper was the only record the college had of these tests. (Pl. Ex. 24, 25; Tr. 276–86, 1228, 1230–31) The aptitude tests are furnished to the college by the J.A.C. and are customarily returned to Mr. Sonn after they have been scored. (Tr. 273, 275)

18. The Flanagan aptitude test was not selected by Seattle Community College, but is part of the requirements established on a national basis by the International Association of Bridge, Structural and Ornamental Ironworkers. (Tr. 204–05; Defendant's Ex. H–6, p. 66) The coordinator of testing at Seattle Community College has not performed any statistical studies concerning the validity of the test as it related to performance as an ironworker or success in the ironworker apprentice program.

(Tr. 287–88) The testing office of Seattle Community College has not in fact acted as an independent professional agency for the administration of the test, but has merely performed a service for the J.A.C. under the J.A.C.'s direction and without exercising any control over testing policies.

19. The Court finds that defendant J.A.C. adopted a policy of requiring aptitude tests of its applicants to impose higher standards and qualifications upon persons applying after July or August of 1967 than were imposed upon persons who applied before that date. The Court also finds that this change from previous practice was at least in part racially motivated. Moreover, it is clear that blacks as a group do in fact perform more poorly on this test than do whites.

Based on the foregoing Findings of Fact regarding the Ironworkers Joint Apprenticeship Committee the Court makes the following:

## CONCLUSIONS OF LAW

1. Defendant J.A.C. is a joint labor-management committee controlling apprenticeships within the meaning of 42 U.S.C. § 2000e–2(d).

2. The Court has jurisdiction over the subject matter of this action and the parties to it by virtue of Title VII of the Civil Rights Act of 1964. 42 U.S.C. § 2000e et seq. The Attorney General is authorized under Section 707(a) of that Act to institute suit to enjoin a pattern or practice of discrimination and request such relief as may be necessary to insure the full enjoyment of rights described in Title VII, 42 U.S.C. § 2000e–6(a).

3. Defendant J.A.C. has pursued a pattern and practice of conduct with respect to employment opportunities in the construction industry which has denied blacks because of their race or color the same opportunities made available to whites.

III

FINDINGS OF FACT APPLICABLE
TO SHEET METAL WORKERS
LOCAL 99

1. Local 99 is an unincorporated association of approximately 1,400 men working in the sheet metal trade. Its principal office is at 2800 First Avenue, Seattle, Washington. The jurisdiction of Local 99 is within King County in the State of Washington. (Admitted Facts, par. 2)

2. There are two divisions in Local 99. The building trades division (sometimes referred to as the construction division) is composed of members working in building construction and sheet metal shop work. The marine division represents sheet metal workers employed in the shipyards. (Tr. 446)

3. There are approximately 900 members in the construction division. Of that number, one, Leonard O'Neale, is black. He has been a member of Local 99 since the summer of 1968. (Pl. Ex. 243, p. 12) The evidence never clarified whether Jettie Murray, another black, is also a member of Local 99. (Pl. Ex. 238, pp. 31, 54; Pl. Ex. 272; Tr. 515–16, 530)

Murray and O'Neale are the only two blacks ever referred to work by Local 99. (Tr. 533) Murray worked out of Local 99 between June 1966 and July 1967. (Pl. Ex. 238, pp. 26–27, 34) O'Neale has worked continuously out of Local 99 since 1966. (Pl. Ex. 243, pp. 3–11) Both men were originally referred at a time when there was an extreme shortage of men in Local 99. (Pl. Ex. 51)

4. There are approximately 500 sheet metal workers represented by the marine division. Approximately 250 are members and 250 are applicants for membership. (Admitted Facts, par. 4)

5. Workers in the construction division are paid at the rate of $6.17 per hour. Workers in the marine division are paid $4.18 per hour. (Admitted Facts, par. 7)

6. Within the construction division there are two main classifications of workers: journeyman sheet metal men and journeyman welders. They are both compensated at the same rate of pay. (Pl. Ex. 247, p. 48) The majority of sheet metal men can also weld, and there are welders who pick up sheet metal skills by on the job experience. (Pl. Ex. 243, pp. 10–11; Pl. Ex. 247, pp. 29–31; 50–51)

7. Local 99 through the operation of a hiring hall controls a substantial portion of the building trades sheet metal work in the Seattle area. (Tr. 449)

8. Pursuant to collective bargaining agreements Local 99 is the exclusive source of building trades sheet metal workers for contractors who are parties to the agreements. Employers request men for the union and in the event that the union is unable to supply qualified workmen to fill such requests within forty-eight hours, the employers may hire workmen directly. (Pl. Ex. 43, p. 36)

9. In order to supply workers Local 99 maintains an out of work book which union members and applicants for membership who have previously worked under the union's collective bargaining agreement sign when seeking work. Workers who are not members or who have not been previously employed under the collective bargaining agreement are not permitted to have their names placed on the out of work list. (Tr. 1553) However, their name and phone number is taken and if work is available they will be called and sent out. (Tr. 479–80)

10. In response to an employers' request for men the union dispatcher refers those who have been on the out of work list the longest. However, once a member or applicant for membership has his name placed on the out of work list he may solicit work from union contractors and a contractor may call the union and ask for such individual by name irrespective of his position on the out of work list. (Tr. 480, 482) Union contractors may not employ non-union men who solicit employment except in circumstances

where the union is unable to supply workers within forty-eight hours. (Tr. 483, 1555) In summary, a non-union sheet metal worker who desires to apply for membership and have his name placed on the out of work list must either serve an apprenticeship or pass a journeyman's competency examination.

11. Welders are not required to take a competency examination as a prerequisite to work referral and membership. A valid card of certification will suffice as proof of competency. (Tr. 477)

12. Melvin Harris is a black welder skilled in basic welding, gas welding, electric arc welding, and heliarc welding. (Tr. 296–97) Between 1967 and 1969 he contacted Local 99 approximately 20 times in an effort to obtain construction referral. He was uniformly unsuccessful. (Tr. 307, 310, 313)

a. Harris first sought work through the union in the spring of 1967. He was told by the union dispatcher that a city welding certification was necessary before he could be sent to work and that all the welders referred by Local 99 were city certified. At that time Harris did not possess a certification card and was not sent to work. (Tr. 303–04) Jerry Brown, a white welder, was referred out numerous times by the union between 1966 and 1968 despite the fact that he was not city certified. (Tr. 546–49)

b. Harris obtained city certification and went back to Local 99 in May of 1967 seeking work. (Tr. 305) The union dispatcher told him that work was slow and that he should keep checking back. His name was not taken or put on the out of work list nor was the operation of the hiring hall explained. (Tr. 305–06) He returned numerous times between June and November of 1967 and was always told that work was slow, but to check back again. His name was not taken nor was the work referral system explained to him. (Tr. 307–08; 310–11) Minutes of the union membership meetings held during this time disclose that employment opportunities were excellent and that there were periodic shortages of men. (Pl. Exs. 56, 57, 58)

Between January and August of 1968, Harris sought work several times. The union dispatcher again told him that work was slow. His name was not taken nor was the work referral system explained. (Tr. 310–13)

c. In 1969 Harris inquired about work on many occasions at Local 99 beginning in February or March. The union response was the same. In July of 1969 Harris' name and phone number were taken for the first time by the union. However, he was not referred to a job. (Tr. 313–15)

13. Odel Gilbreath is a black welder who is certified by the City of Seattle. He sought work through Local 99 in the latter part of 1968. At that time he was told by the union that no jobs were available and that he could not be referred to work because he was not a member of the union. He received no other information and was not referred to a job. (Tr. 321–22; 328–29)

14. Cornelius Bradford, a black welder, possesses a city certification and many other types of welder certifications. (Pl. Ex. 239, p. 9) He sought construction employment through Local 99 several times in the summer of 1969. Bradford was told by the union that there was no work. His name and phone number were taken and he was later offered a job in the shipyards but not in construction. (Pl. Ex. 239, p. 13–15, 21)

15. John Buckner, a black welder possessing a Navy welding certificate, sought work through the union in April of 1969. He, at that time, was employed as a welder in the shipyards and was looking for higher paying construction work. Buckner left his name and was later called by the union and asked if he had a city certificate. He replied no but that he would get one if a job was available. Buckner was told by the union that something might come up in the future but had no further contact with Local 99. (Pl. Ex. 242, p. 6, 20–25)

16. The employment conditions in the building trades division of the sheet metal industry from 1965 through the

latter part of 1969 were very good. (Pl. Exs. 44, 46, 50, 56, 59) The demand for sheet metal workers was so great in the last two or three years that the sheet metal course taught at Seattle Community College was reduced in duration from two years to one in order to supply men to meet the needs of the industry. (Tr. 1606)

17. During the times of the manpower shortage Local 99 contacted other unions to obtain construction workers. During the period between 1966 and December 1969, 360 members of other sheet metal locals throughout the country transferred into Local 99. (Pl. Ex. 247, pp. 38–41; Admitted Facts, par. 8)

18. A sheet metal worker, who is neither a welder nor a member of Local 99 or an applicant for membership with prior experience under the collective bargaining agreement, must take a competency examination. An individual who passes may have his name placed on the out of work list and be eligible for work referral and membership. (Tr. 465–66; Pl. Ex. 247, p. 64)

19. Between 1956 and 1962, Local 99 did not regularly give a competency examination. (Tr. 1294) From 1965 to April 1968, Local 99 administered approximately 162 building trades competency examinations. Of that number 74, or 46 percent of those taking it were admitted into Local 99. (Admitted Facts, par. 5) The passing score for the examination was 80 percent. (Pl. Ex. 247, p. 91)

20. The job of administering a competency examination was given to Seattle Community College in April of 1968. (Pl. Ex. 247, pp. 88–9) The stated purpose was to preclude any appearance of unfairness. (Tr. 379–80, 540, 41) Of the 29 taking the test at the college since April 1968, only four, 14 percent of those taking it, were admitted into the union. (Admitted Facts, par. 6)

21. Since Seattle Community College was given the duty of administering the examination, officials of Local 99 have continued to administer it to certain individuals at the union hall. (Tr. 470–72, 537–38) At least one of these individuals scored below the passing mark yet was referred to work by the union. (Tr. 369–71) Another examinee was never advised of his score, though he was told he passed. (Tr. 355–56) Local 99 was unable to locate the actual examinations of the persons who have taken it at the union hall since April 1968. (Tr. 474)

22. The examination given at the union hall since April 1968 has been a one part journeyman's examination. (Tr. 540) The examination given at Seattle Community College has, at the direction of the union, been a two part journeyman and apprentice test. The first part was devised by the union and the second by an instructor at the college. (Tr. 382–83)

23. It is the policy of Local 99, based upon the advice of counsel, not to file reports of the racial composition of the union with the Equal Employment Opportunity Commission. (Pl. Ex. 247, p. 107)

From the foregoing Findings of Fact regarding Sheet Metal Workers Local 99 the Court makes the following:

## CONCLUSIONS OF LAW

1. Local 99 is a labor organization within the meaning of 42 U.S.C. § 2000e (d) and is engaged in an industry affecting commerce within the meaning of 42 U.S.C. 2000e(e).

2. The Court has jurisdiction over the subject matter of this action and the parties to it by virtue of Title VII of the Civil Rights Act of 1964. 42 U.S.C. § 2000e et seq. The Attorney General is authorized under § 707(a) of that Act to institute suit to enjoin a pattern or practice of discrimination and request such relief as may be necessary to insure the full enjoyment of rights described in Title VII. 42 U.S.C. § 2000e–6(a)

3. Defendant Local 99 has pursued a pattern and practice of conduct with respect to employment opportunities in the construction industry which has denied

blacks because of their race or color the same opportunities made available to whites.

## IV

FINDINGS OF FACT APPLICABLE TO SHEET METAL WORKERS LOCAL 99 JOINT APPRENTICE-SHIP AND TRAINING COMMITTEE

1. Defendant Sheet Metal Workers Joint Apprenticeship and Training Committee (J.A.T.C.) is an unincorporated body composed of eight members, of whom four are representatives of Sheet Metal Workers Local 99 and four are representatives of contractors party to a collective bargaining agreement with Local 99. (Admitted Facts, par. 2)

2. The J.A.T.C. administers and controls the apprenticeship program in the construction phase of the sheet metal industry within the jurisdiction of Local 99 and determines which persons shall be admitted to this program. (Admitted Facts, par. 3)

3. At present there are approximately 100 apprentices indentured in the sheet metal apprenticeship program of whom seven are Negro. Five of the seven were accepted after September 1969, and the other two were accepted in May 1968. No other Negroes ever participated in the sheet metal apprenticeship program. (Admitted Facts, par. 4)

4. The J.A.T.C. has its offices at 2800 First Avenue, Seattle, Washington. It shares an office with Sheet Metal Workers Local 99. (Admitted Facts, par. 5)

5. The purpose of the apprenticeship program is to train apprentices to become journeymen in the sheet metal trade. After their acceptance into the program, apprentices are indentured to the J.A.T.C. and are enrolled in a four year program involving on the job training and related classroom instruction. (Admitted Facts, par. 6)

6. According to the published standards for admission to the sheet metal apprenticeship program since 1965, applicants should be between the ages of 18 and 24 (excluding time spent in military service), pass a GATB aptitude test, complete an application form and submit a high school transcript. Preference is given to high school graduates. (Pl. Ex. 90, p. 6; Pl. Ex. 91, p. 6; Pl. Ex. 92, p. 6; Pl. Ex. 107)

7. Applicants are interviewed by the J.A.T.C. which evaluates their qualifications and votes to accept or reject each applicant. There is no objective evaluation process. If an applicant is accepted, his name is placed on a waiting list and he is assigned work when employment is available. The committee votes to determine the order in which the accepted applicants will be referred out. (Pl. Ex. 107, pp. 4–5)

8. The J.A.T.C. periodically closes its application books when the demand for apprentices is disproportionately low to the number of applicants on hand. The J.A.T.C. advises the Apprenticeship Information Center and the Apprenticeship Division, Washington State Department of Labor & Industry when the books are closed. (Admitted Facts, par. 7)

9. Approximately one-third to one-half of the current sheet metal apprentices attended a pre-apprenticeship training program at Seattle Community College before being accepted into the program. (Tr. 1609; Pl. Ex. 94)

10. Prior to 1968, when the first full-time coordinator was appointed, applicants had to go to the union hall to file an application. If the individual did not meet the program's requirements he could be told by the union that he was not acceptable for the program. (Pl. Ex. 107, pp. 5–6) Union officials and office personnel continue at the present time to furnish applications to prospective applicants when the coordinator is not available. (Pl. Ex. 248, p. 60; Tr. 1117)

11. From the following facts the Court infers that the J.A.T.C. has given preference to friends and relatives of union members and union contractors and that this has had the practical result of denying to blacks an equal opportunity

to learn about and be accepted into the sheet metal apprenticeship program:

a. The sheet metal apprenticeship application form requests the name and occupation of the applicant's father. (Pl. Ex. 93)

b. The J.A.T.C. had notice that 30 of the 99 currently indentured apprentices indicated on their applications that their fathers were sheet metal workers. (Pl. Ex. 104a; Pl. Ex. 95)

c. Prior to the summer of 1969, information concerning the sheet metal apprenticeship program was principally made known to persons having contact with the sheet metal trade, virtually all of whom were white. (Pl. Ex. 295, pp. 37-38)

d. The Chairman of the J.A.T.C. has stated that they 'will more or less look favorably on an individual who has family members who are sheet metal workers. This indicates to us that the individual had some familiarity with the field and therefore stands a better chance of becoming successful in it." (Pl. Ex. 107, p. 3)

e. William Pfiel's application form put the J.A.T.C. on notice that he applied on January 12, 1968. Pfiel was indentured into the apprenticeship program the same day. (Pl. Ex. 95) Pfiel is the son of the Chairman of the J.A.T.C. (Pl. Ex. 295, p. 36; Pl. Ex. 95) The J.A.T.C. had notice from the face of Pfiel's application that he applied at a time the J.A.T.C.'s application books were closed. (Pl. Ex. 106; Pl. Ex. 95) Pfiel was accepted ahead of two blacks, George Brooks and Glenn Blakely, who the J.A.T.C. had notice applied before him. (Pl. Ex. 95)

f. The older application forms used by the J.A.T.C. did not ask for the occupation of the applicant's father. On some of these applications marginal notations were made indicating the applicant's relatives who were in the trade. (Pl. Ex. 98—"brother and dad in trade"; Pl. Ex. 99—"Ed Kubacki's son-in-law")

12. The J.A.T.C. regularly accepts applicants whose application forms have put it on notice that the applicant is ineligible for consideration under published standards. The following are instances where the J.A.T.C. has apparently ignored such notice:

a. The age requirements of the program are 18–24. The J.A.T.C. nonetheless has accepted applicants whose application forms put the J.A.T.C. on notice that the applicants were far over-age. (Pl. Ex. 97; Pl. Ex. 100) The J.A.T.C. has rejected applicants who were under 18 (Pl. Ex. 110—Paul Martin); and at other times has accepted applicants who the J.A.T.C. had notice indicated on their application that they were under age and the sons of sheet metal workers. (Pl. Ex. 104a—Ronald Hesse; Robert G. Matayo; Pl. Ex. 95)

b. The published standards state that high school graduates are preferred. This standard is inconsistently enforced. On one occasion the J.A.T.C. accepted an applicant who had put it on notice that he had a ninth grade education (Pl. Ex. 96—Rodney Arnold), and on another occasion rejected an applicant for the reason that he was one-half credit short of his high school diploma. (Pl. Ex. 110—McGrath) Nine of the currently indentured apprentices indicated on their applications that they were not high school graduates. The J.A.T.C. had notice that four of these stated on their applications that they were sons of sheet metal workers. (Pl. Ex. 95; Pl. Ex. 104a)

c. It is the stated policy of the J.A.T.C. not to interview an applicant until he has submitted a high school transcript and aptitude test. (Tr. 1108–09) However, the J.A.T.C. has conducted interviews and on occasion has accepted persons before they have submitted either of these documents. (Pl. Ex. 108; Pl. Ex. 116—Thomas Stoll; Pl. Ex. 118—Dickson and Alexander; Pl. Ex. 119—Lee and Reed; Pl. Ex. 111)

d. The J.A.T.C. frequently closes its application books. During such periods applications are not supposed to be taken. (Admitted Facts, par. 7; Pl. Exs. 106,

112, 114, 115, 117) However, the J.A.T.C. has permitted persons to apply even though it had notice from the face of the application forms that the applications were being made while the books were closed. For example, the books were closed from December 26, 1967 to May 27, 1968. The reason given for closing the books at this time was the large number of applicants on hand. Nevertheless, during the period the books were closed four persons were accepted whose application forms indicated that the applications were made while the books were closed. (Pl. Ex. 95—Pfiel, Buske, Grantham, Mellema) The committee was on notice that two of these applicants were indentured into the program on the date they applied. (Pl. Ex. 95—Pfiel, Buske) It is not clear from the J.A.T.C.'s records how often applications are accepted, but it seems clear that the books have been closed a substantial portion of the time since December 1967. (Pl. Exs. 106, 112, 114, 115 and 117)

From the facts set forth in the foregoing paragraph, it is reasonable to infer and the Court so finds that the J.A.T.C. has closed its books in order to limit the number of applicants while at the same time give preference to relatives and friends of persons in the trade; further, that relatives and friends either have knowledge concerning when the books are open or are permitted to apply even when the books are supposed to be closed.

13. Based on the following facts the Court finds that the J.A.T.C. discriminated against George Brooks and Glenn Blakely, two blacks who applied in 1967, by giving preferential treatment to whites who applied after them.

a. George Brooks contacted Glenn Arnold, Local 99's Business Representative, in November 1967 and inquired about the apprenticeship program. (Tr. 375, 1024; Pl. Ex. 95, p. 56) Arnold suggested that Brooks enroll in a one-year, full-time pre-apprenticeship sheet metal training course at Seattle Community College to prepare him for the sheet metal apprenticeship program, even though Brooks had four years experience in the sheet metal trade. (Tr. 376, 1022–23) Brooks was accepted and indentured in the apprenticeship program in May 1968 after spending seven months in the Seattle Community College day school. (Tr. 1024–27; Pl. Ex. 95, p. 58)

b. Several of Brooks' classmates in the day school who also were accepted into the apprenticeship program were given one year's credit for their day school experience. Brooks was given no credit for the seven months he spent in the day school. (Tr. 1031; Pl. Ex. 95—Buske, Mellema, and Grantham)

c. William Pfiel, the son of the Chairman of the J.A.T.C., applied on January 12, 1968 and was indentured on the same date. (Pl. Ex. 95, 104a) He did not have to attend the pre-apprenticeship training course at day school. (Pl. Ex. 94) The J.A.T.C. had notice from its application forms that two blacks—Brooks and Blakely—applied before Pfiel, but were not accepted and indentured into the program until May 1968. (Pl. Ex. 95, 104a)

14. Based upon the following facts the Court finds that the defendant has discouraged blacks from applying to the apprenticeship program and from following through with their applications.

a. Willie Thomas is a black who attempted to apply to the sheet metal apprenticeship program in March 1969. (Tr. 390) In the course of four visits to the union he was not given an application or any information concerning the program. (Tr. 396) Thomas was never contacted by the J.A.T.C. even though he left his test results at the union office and the State Employment Service sent the union a copy of his high school transcript. (Pl. Ex. 280; Tr. 396) The normal practice of the personnel in Local 99's office is to furnish an applicant with an application if the coordinator is not available. (Pl. Ex. 248, p. 60; Tr. 1117)

b. Bruce M. Bibb is a black who applied for the sheet metal apprenticeship program in June 1969. (Tr. 398–99)

Bibb was referred to Local 99's office by the State Employment Service with a letter. He spoke to a woman behind a window and asked for a man who was to look at his test results. (Tr. 405) He returned a few days later at which time he spoke to a man who invited him into the office. Bibb gave the man his test results. (Tr. 406) Contrary to the normal practice, Bibb was not offered an application for the apprenticeship program on either of these two occasions. (Tr. 407) He returned a few days later but was told the man he was to see was not in. (Tr. 408) Bibb was never contacted by the J.A.T.C. (Tr. 409)

c. In the summer of 1969, the Urban League referred several blacks to the sheet metal apprenticeship program. (Pl. Exs. 250–253, 291; Tr. 412) They were not given an application the first time they went to Local 99's office but were told to return as the apprentice coordinator was on vacation. (Tr. 415; Pl. Exs. 251, p. 13; 250–253, 291) At least four of them returned a second time, met with the coordinator, and were given applications to fill out. (Pl. Ex. 105) The coordinator told them, among other things, that there was a long waiting list and made other comments that generally discouraged them. (Pl. Exs. 251, pp. 16, 17; 250, pp. 21, 23, 24, 26, 31; 253, pp. 11, 14, 22, 27, 31; Tr. 419–20) At the time these men applied there could not in fact have been a waiting list, since the J.A.T.C. began accepting applicants again in September and all of the persons whose applications were accepted after September had applied subsequent to the time (July) when the blacks referred by the Urban League applied. (Pl. Ex. 95, 104a)

15. The applications of blacks have been treated differently from those of whites. Four blacks applied for the program on July 14, 1969. (Pl. Ex. 105, 250, 251, 253, 291) No action was taken on their applications by the J.A.T.C., ostensibly because they were not complete in that the J.A.T.C. had not received the applicants' high school transcripts and aptitude test results. (Tr. 1108,

1110) No effort was made by the J.A.T.C. to contact these black applicants to determine whether they were still interested in the program. (Tr. 1110) Both before and after July 14, 1969, however, whites have been interviewed by the J.A.T.C. prior to the time they submitted their high school transcripts or took their aptitude tests and have been accepted subject to completing their requirements. (Pl. Ex. 108; Pl. Ex. 116—Thomas Stoll; Pl. Ex. 118—Melvin Dickson and Donald Alexander; Pl. Ex. 119—James Lee and Wilbert T. Reed; Pl. Ex. 111)

Based on the foregoing Findings of Fact regarding Sheet Metal Workers Local 99 Joint Apprenticeship and Training Committee the Court makes the following:

## CONCLUSIONS OF LAW

1. Defendant J.A.T.C. is a joint labor-management committee controlling apprenticeships within the meaning of 42 U.S.C. § 2000e–2(d).

2. The Court has jurisdiction over the subject matter of this action and the parties to it by virtue of Title VII of the Civil Rights Act of 1964. 42 U.S.C. § 2000e et seq. The Attorney General is authorized under § 707(a) of that Act to institute suit to enjoin a pattern or practice of discrimination and request such relief as may be necessary to insure the full enjoyment of rights described in Title VII. 42 U.S.C. § 2000e–6(a)

3. Defendant J.A.T.C. has pursued a pattern and practice of conduct with respect to employment opportunities in the construction industry which has denied blacks because of their race or color the same opportunities made available to whites.

## V

## FINDINGS OF FACT APPLICABLE TO PLUMBERS AND PIPE-FITTERS LOCAL NO. 32

1. Defendant Local 32 is a labor organization consisting of an unincorporated association of members engaged in the plumbing and pipefitting industry in

the State of Washington in the following counties: King, Clallam, Chelan, Jefferson, the western portions of Okanogan and Douglas, and the northern tip of Kittitas from the 47°15′ line. The union's offices are located at 2311 Second Avenue, Seattle, Washington. (Admitted Facts, par. 1 and 2)

2. Local 32 has approximately 2,800 members. (Admitted Facts, par. 2) Approximately 1,900 members are in the construction classifications, i.e., plumber, steamfitter, welder, or refrigeration mechanic. (Admitted Facts, par. 10–13; Tr. 582, 583) Only one of the construction classification members is black. (Tr. 598, 599) He is David Williams, a welder whose application was accepted in September 1966, when Local 32 was recruiting from the Boilermakers' Union (Pl. Ex. 258, pp. 52–53) in order to alleviate an acute shortage of welders. (Pl. Ex. 254, pp. 38, 56, 62) Local 32 has 92 black members in its non-construction divisions. (Admitted Facts, par. 14) Virtually all of these blacks are employed as marine pipefitters in the shipyards, where the hourly wage rate for journeymen is $4.18. The hourly wage rate for journeymen in the construction trades is $6.25. (Tr. 599)

3. Local 32 maintains an exclusive hiring hall providing plumbers, steamfitters, welders, and refrigeration mechanics for employers in the construction industry with whom it has a collective bargaining agreement. (Admitted Facts, par. 14) The agreement provides that the hiring hall of Local 32 shall be the exclusive source of employees performing plumbing and pipefitting work within the jurisdiction of Local 32. (Pl. Ex. 126, Art. V; Pl. Ex. 127, Section 1) Employers may hire from sources other than the union hall only if the union does not fill an order within five days. (Pl. Ex. 126, Art. V, Section 6) Workmen hired in this manner are then required to obtain union membership by their eighth day of employment. (Pl. Ex. 126, Art. IV, Section 1) Local 32 is a party to collective bargaining agreements with employers in the construction industry performing approximately 90 percent of the plumbing and pipefitting work within the jurisdiction of Local 32. (Admitted Facts, par. 3)

4. Local 32 is party to a collective bargaining agreement with shipyard employers within its jurisdiction. (Def. Ex. E–6, Tr. 1624, 1625) Article 3(c) of this agreement requires the employers to give the union 24 hours advance notice when additional employees are needed. In practice, most workmen are hired directly by the shipyards (Pl. Ex. 254, pp. 43–44), which establish their job qualification standards independently of the union. (Def. Ex. E–6, Art. 3(c) (2) (b); Tr. 1624) Shipyard employees are required as a condition of continuing employment to apply for union membership on the 31st day after employment and to maintain union membership. (Def. Ex. E–6, Art. 3(b)) The remaining non-construction employers for whom Local 32 members work hire their employees directly. (Pl. Ex. 254, pp. 20–21)

5. Journeyman membership in Local 32 may be obtained in three ways: completion of the Local 32 joint apprenticeship program (Pl. Ex. 125, § 165); transfer from a sister local of the United Association (Pl. Ex. 124, § 181); and direct admission as a journeyman member. (Pl. Ex. 124, § 158)

6. Local 32's stated membership requirements are prescribed by the constitution of the United Association. (Pl. Ex. 124) According to Section 158 of the Constitution, every applicant for membership as a building trades journeyman member must have a minimum of five years actual, practical working experience in the plumbing and pipefitting industry; be of good moral character; and pass a satisfactory examination as to his skill and ability as a journeyman.

7. Applicants for direct construction division membership are questioned concerning their experience by the Business Manager or a business representative of Local 32 upon their initial contact with Local 32. (Tr. 586; Pl. Ex. 254, pp. 22–23) This initial screening determines whether an applicant will be allowed to

appear before the Executive Board. (Tr. 586) The applicant must then complete affidavits attesting to his experience and submit them to the Executive Board. This experience may be at any branch of the trade, including marine pipefitting. (Pl. Ex. 254, p. 23) If he is approved by the Board, the applicant may file an application for membership. He is then initiated as a journeyman member upon successful completion of the journeyman examination and payment of his initiation fee. (Tr. 586-588)

8. Persons seeking referral from Local 32 are required to sign the out of work list maintained in the Local 32 office. (Tr. 584) The policy of Local 32 is to limit job referrals to members of Local 32, applicants for membership in Local 32, and members of sister United Association (U.A.) locals. (Tr. 585, 589) The union will not refer persons who are not union members or applicants for membership. (Tr. 1627)

9. Local 32 on occasion has allowed whites with less than five years experience to apply for membership and be referred for employment as building trades journeymen. (Tr. 587; Admitted Facts, par. 7, 8; Pl. Ex. 254, pp. 27-28; Tr. pp. 706-708, 702) Local 32 also does not require the successful completion of a journeyman test for referral, and has continued to refer as construction division journeymen workmen who have failed the journeyman examination two or more times. (Pl. Ex. 254, pp. 30-31; Tr. 589)

10. Local 32 maintains separate out of work lists for the plumber, steamfitter, refrigeration mechanic and welder classifications. (Pl. Ex. 254, pp. 20, 37-38; Tr. 585) Each list is then broken down into "A", "B", and "C" categories based on the following criteria:

"A" list: All journeyman members or applicants for membership in Local 32 of the United Association maintaining an occupational residence within the area covered by Local 32's Agreement;

"B" list: All journeyman members of the United Association maintaining an occupational residence outside the area covered by Local 32's Agreement but within the State of Washington;

"C" list: All journeyman members of the United Association with a residence outside of the State of Washington. (Pl. Ex. 254, p. 22; Tr. 585, 586, 589)

In order for a journeyman on the "B" or "C" list to move to the "A" list, it is necessary that he maintain his registration in Local 32's hiring hall for a continuous one year period. (Pl. Ex. 127, p. 3) Referrals are generally in the order of seniority on the lists, with the "A" list having first priority, then the "B" and "C" lists. All employers using the list have the right to call by name for any person previously employed by them in any area covered by a Local 32 agreement, or any person who is to be employed as a foreman. In these instances, the workman is dispatched to the employer irrespective of his position on the out of work list. (Pl. Ex. 127, pp. 2-3)

11. Although separate out of work lists are maintained for the different trade classifications, persons may be and have been referred in a classification other than their own when there is a shortage of men in another classification. (Admitted Facts, par. 18) The men to be referred out of classification are obtained by contacting the dispatcher for the other classifications for names of men out of work, and also by contacting men working in the shipyards when there is a shortage of men in the construction classifications. (Tr. 591-93)

12. Based on the following facts this Court finds that Local 32 has discriminated against blacks on the basis of their race or color by failing to inform them of the union's procedures for referral and membership; by failing to refer them for work, allow them to apply for membership, or sign the out of work list; and by providing them with false or

misleading information on work conditions in the trade.

a. Cornelius Bradford, a black pipe welder with five years experience and several certifications, contacted Local 32's office on Second Avenue in the summer of 1969, and sought referral as a pipe welder. (Tr. 611) It is the practice of Local 32 to question non-member applicants for work about their experience at the trade, (Tr. 586) and these persons must apply for membership before they are placed on the out of work list and referred for employment. (Tr. 589, 1627) When Bradford asked the man behind the counter for work as a pipe welder he was neither questioned about his experience nor informed of the procedure for applying for membership, and he was told that it would do no good to leave his name. (Tr. 611, 612) Bradford was told when he sought referral that there was no work available for welders and that there would be none for three or four months. (Tr. 611) In fact, the general outlook for work was considered good by Local 32 in May 1969 (Pl. Ex. 153), and between April 28, 1969 and September 4, 1969, the union made 156 welder referrals. (Pl. Ex. 154)

b. Charles Brewer, a black with some plumbing and pipefitting experience, sought referral from Local 32 for plumbing or pipefitting work in 1960 and 1967. (Pl. Ex. 255, pp. 13, 16, 17) It is the practice of Local 32 to question non-member applicants for work about their experience at the trade, (Tr. 586) and these persons must apply for membership before they are placed on the out of work list and referred for employment. (Tr. 589, 1627) When Brewer asked for work as a plumber or pipefitter at the union office, he was neither questioned about his experience nor informed of the procedure for applying for membership. (Pl. Ex. 255, pp. 16–17) On both occasions, Brewer was told there was no work available. In fact, in 1967 there was a continuing shortage of plumbers in Local 32's jurisdiction, (Pl. Ex. 148–151) and during 1966 and 1967 Local 32 was referring as journeyman plumbers persons with as little as two years experience. (Admitted Facts, par. 7; Pl. Ex. 254, p. 27)

13. Based on the facts found in paragraphs 14 through 16, below, this Court finds that Local 32 has discriminated against blacks on account of their race or color by applying to them more stringent standards for membership and referral than those it has applied to whites.

14. Laffie Sanders, a black refrigeration mechanic, sought membership and referral from Local 32 in June 1967. At that time he had had almost four years refrigeration experience in the United States Navy and had served in a supervisory capacity for over two years with as many as eleven men under his supervision. He was responsible for the air conditioning and refrigeration equipment on the aircraft carriers on which he was stationed, including the nuclear carrier Enterprise. (Tr. 709–12) Sanders was told by Thomas Falconer, then dispatcher and business representative for Local 32, that he needed five years experience at the trade in order to seek journeyman membership in the union. (Tr. 713)

a. Local 32 has not required whites to have five years experience at the trade prior to referral and membership. (Admitted Facts, par. 7 and 8; Tr. 587) Gregory Ripley, a white journeyman member of Local 32, had no more than three and one-half years experience when his application for journeyman membership was accepted, and he was initiated one year later. (Tr. 702, 703) Gordon Welch, a white journeyman member of Local 32, was accepted on application as a journeyman although his experience consisted of seven years as a full-time truck driver for a plumbing shop, and he was initiated a year and a half later. (Tr. 706–08)

b. During 1966 and 1967 Local 32 had a shortage of construction journeymen and was referring persons with as little as two years experience in the trade. (Tr. 587; Pl. Ex. 254, pp. 20, 26–27, 56) For example, Donald Fisher, a white marine pipefitter helper with less than

three years experience in the shipyards, was referred as a refrigeration journeyman during this period. (Admitted Facts, par. 20; Pl. Ex. 133, 134; Tr. 600, 601)

15. Lionel Hampton, a black marine pipefitter with one and a half years experience, was referred to Local 32 in January 1968 by Lockheed Shipyard for dispatch as a marine pipefitter helper. (Tr. 640, 641) He was told by Thomas Falconer, dispatcher and Business Representative for Local 32 and also Local 32 Apprentice Coordinator, that he had insufficient experience to be referred as a helper and would have to join the marine pipefitter apprenticeship program. (Tr. 641) According to the shipyard's collective bargaining agreement and the testimony of Grant Wood, Local 32's Business Manager, the shipyard has the responsibility for determining the qualifications of the men it employs, and if the shipyard requests a man the union will issue him a dispatch slip without questioning his qualifications. (Tr. 1625, 1626; Def. Ex. E-6, p. 3)

16. Lionel Hampton worked at Lockheed as a marine pipefitter apprentice from January 1968 until March 1969, when he voluntarily terminated both from Lockheed and from his apprenticeship because of derogatory racial remarks made by the coordinator, Thomas Falconer, and what he considered to be the inadequacy of the training he was receiving in the program. (Tr. 642, 645) Hampton then contacted Todd Shipyard and was immediately hired as a journeyman pipefitter without going through the union. (Tr. 642, 643; Def. Ex. E-3, pp. 1, 5) He was accepted on application as a marine pipefitter helper by the union after he had been employed for 30 days by Todd's. (Tr. 643) Hampton was subsequently discharged from Todd's on September 3, 1969. On the day of his discharge, Hampton called Joe McCaffrey, dispatcher and business representative for Local 32, and sought referral back to Todd's. McCaffrey said he would check on it. The following day McCaffrey told Hampton that neither

Todd's nor Lockheed would take him back and that his application for membership would be cancelled. (Tr. 649) Hampton subsequently received a letter, dated September 22, 1969, cancelling his membership and returning his payments on his initiation fee. (Pl. Ex. 120; Tr. 650) Grant Wood, Business Manager of Local 32, testified that Hampton was not dispatched when he sought referral from Local 32 because he was not a member or applicant for membership, and was therefore not eligible for referral (Tr. 1627), and that Hampton's application for membership had been cancelled because he was unemployable and had failed to make proper payments on his initiation fee. (Tr. 1631, 1632) Wood testified that the reason Hampton was unemployable was that he had been terminated for cause from both Todd's and Lockheed (Tr. 1631, 1635), and that Todd's would not rehire him. (Tr. 1622) Wood further testified that had Hampton sought referral immediately upon his discharge from Todd's he would have been dispatched if there were a call for men. (Tr. 1636)

a. Hampton in fact did seek dispatch from Local 32 immediately upon his discharge from Todd's and prior to the cancellation of his membership (Tr. 649) and was refused dispatch at that time. (Tr. 649)

b. Hampton was not in fact discharged from Lockheed, but terminated voluntarily. His termination slip indicates that he was eligible for rehire and contains favorable comments on his ability as a pipefitter. (Def. Ex. E-5, pp. 17-18)

c. It is the practice of Todd Shipyard to send a letter to the union if a discharged employee is not eligible for rehire. (Tr. 1433) Grant Wood testified that the union received such a letter with regard to Lionel Hampton (Tr. 1622-24), but he was unable to produce it in response to a subpoena. (Tr. 1776) The Director of Industrial Relations at Todd's testified that no such letter was sent, and that Hampton would be eligible

for rehire at the shipyard if the union referred him. (Tr. 1433–34)

d. Regardless of Hampton's employment record at Todd's and Lockheed, Local 32 has collective bargaining agreements with three shipyards other than Todd's and Lockheed. (Tr. 1624–25) Hampton was not referred or offered referral to any of these shipyards. Other persons who have been discharged from one shipyard have been referred by the union to another shipyard. (Pl. Ex. 254, p. 73; Pl. Ex. 131b; Tr. 600–601)

e. In the ordinary course of events Hampton's record of fee payments to Local 32 was not enough in itself to warrant cancelling his application. (Compare Pl. Ex. 135 with Pl. Ex. 120) Defendant did not establish that Hampton was unemployable.

17. Some officials of Local 32 have made statements in conjunction with their employment indicating racial bias:

a. Robert E. Lucas is the former president of Lewis Refrigeration, a large nation wide refrigeration contractor. In 1963 or 1964, Lucas called Joe McCaffrey, Local 32's business representative and dispatcher, and requested a black steam fitter. McCaffrey made a racially derogatory remark. (Tr. 781) McCaffrey has been a business representative for the last 27 years. (Admitted Facts, par. 5)

b. Thomas Falconer, a Local 32 dispatcher and business representative from 1957 to September 1968 (Admitted Facts, par. 5), made racially derogatory remarks on at least two occasions, including a suggestion to whites in an apprenticeship class that they should assault two black marine pipefitter apprentices. (Pl. Ex. 259, pp. 4–5) These latter remarks were brought to the business manager's attention by some of the apprentices. (Pl. Ex. 254, p. 65; Tr. 784–785)

c. Lionel Hampton appeared before Local 32's Executive Board approximately in April 1969 to apply for membership as a marine pipefitter. (Tr. 642–643) Hampton testified that Grant Wood was present at this meeting. After his interview Hampton was asked to step outside. While waiting outside he heard an argument during which one of the men in the room said "If he was white you'd let him in." (Tr. 644–47)

18. Based on the following facts, the Court finds that Local 32 has failed to recruit blacks for referral and journeyman membership on the same basis as whites.

a. There has been an increase of approximately 500 men in the membership of Local 32 since 1965. Approximately half of this increase has occurred in the construction division. The apprenticeship program has accounted for approximately 25 new members a year. (Pl. Ex. 254, pp. 77–79) During this period, Local 32 has recruited journeymen for employment in its jurisdiction by contacting the United Association, other craft unions in the Seattle area, and nonunion persons working as plumbers and steamfitters in the Seattle area. (Pl. Ex. 254, pp. 15–16)

b. Ninety-two black members of Local 32 work in the nonconstruction divisions of the Union, virtually all of them as marine pipefitters in the shipyards. Marine pipefitters have jurisdiction over all plumbing and pipe trades work conducted in the shipyards. (Tr. 1659, 1661) Since 1960 there have been frequent periods when there has been a shortage of construction division workmen in Local 32's jurisdiction. (Pl. Ex. 140–145, 147–152; Pl. Ex. 254, p. 20) One method of meeting these manpower demands has been recruitment of men from the shipyards. (Tr. 592) However, no blacks working in the shipyards have ever been referred out to construction jobs. (Pl. Ex. 254, p. 62)

Based upon the foregoing Findings of Fact regarding Plumbers and Pipefitters Local 32 the Court makes the following:

## CONCLUSIONS OF LAW

1. Local 32 is a labor organization within the meaning of 42 U.S.C. § 2000e

(d) and is engaged in an industry affecting commerce within the meaning of 42 U.S.C. § 2000e(e).

2. The Court has jurisdiction over the subject matter of this action and the parties to it by virtue of Title VII of the Civil Rights Act of 1964. 42 U.S.C. § 2000e et seq. The Attorney General is authorized under § 707(a) of that Act to institute suit to enjoin a pattern or practice of discrimination and request such relief as may be necessary to insure the full enjoyment of rights described in Title VII. 42 U.S.C. § 2000e–6(a).

3. Defendant Local 32 has pursued a pattern and practice of conduct with respect to employment opportunities in the construction industry which has denied blacks because of their race or color the same opportunities made available to whites.

## VI

### FINDINGS OF FACT APPLICABLE TO LOCAL 32 PLUMBERS AND PIPEFITTERS JOINT APPRENTICESHIP AND TRAINING COMMITTEE

1. The J.A.T.C. is a joint unincorporated body composed of five representatives of Local 32, and three representatives of the Seattle Plumbing and Pipefitting Employers, one representative of the Refrigeration Contractors' Association and one member from the Puget Sound Shipbuilders Association. The J.A.T.C. office is located at 2307 Second Avenue, Seattle, Washington. (Admitted Facts, par. 2)

2. The J.A.T.C. administers the plumber, steamfitter, refrigeration and marine pipefitter apprenticeship programs for the union and contractors' associations, establishes standards for the selection of candidates for the apprenticeship program, and determines which persons shall be admitted to the program. (Admitted Facts, par. 3)

3. The purpose of the apprenticeship programs is to train apprentices to become journeyman members in this trade. Upon acceptance apprentices are indentured to the J.A.T.C. and are enrolled in a five year program involving on the job training and related classroom instruction. (Admitted Facts, par. 4)

4. The present requirements for application to the building trades apprentice programs (plumber, steamfitter and refrigeration training) are that the applicant:

a. be 18–25 years old, and a high school graduate or the equivalent, or at least 17½ years old, and be graduating from high school within six months;

b. take an aptitude test administered by the Apprentice Information Center. Six years of military service or two years of college can be subtracted to meet the age limit. From April 18, 1969 until January 10, 1970, the age requirement for the building trades apprentice programs was 18–21, with the same provisions for those 17½ and for credit for those with military service and college. (Admitted Facts, pars. 6 and 7) From 1961 to April 1969 the age requirement in the published standards for the building trades apprentice programs was 18–21, for those "not heretofore connected with the trade." No age requirement was published for persons with prior connection with the trade. (Pl. Ex. 169, p. 6; Pl. Ex. 170, p. 5)

5. Applicants for apprenticeship who meet the J.A.T.C. qualifications have their names placed on a waiting list and are ordinarily placed as apprentices when a position is available in the order in which their applications were completed and accepted. When an individual applies for one of the programs, his name is placed in chronological order in a bound volume. This serves as a permanent record of persons applying for the various programs. Separate typed "waiting list" sheets are also maintained, indicating the current positions of persons on the waiting lists. (Tr. 1126–27; Pl. Ex. 258, pp. 22–23)

6. As of January 1970, there were 104 building trades apprentices. None of these is black. (Admitted Facts, par. 9, 10, 11) There have been no black

steamfitter or plumber apprentices since at least 1957. (Admitted Facts, par. 9 and 10) There has been only one black refrigeration apprentice, and he was contacted by the J.A.T.C. only after his employer, a white refrigeration contractor, made an unsuccessful attempt to get him into the program (Tr. 782–785, Pl. Ex. 161), and after the applicant had filed a complaint with the Washington State Board Against Discrimination. (Pl. Ex. 160, 163, 164)

7. One hundred and two applicants are on the December 4, 1969 plumber apprentice waiting list. Three of these applicants are black. Their names, dates of application and positions on the list are: (Admitted Facts, par. 9)

| Daniel Duncan | 10–01–69 | 88th |
| Lionel Hampton | 11–05–69 | 97th |
| Ernest Williams | 11–14–69 | 98th |

Of the 21 applicants on the December 2, 1969 steamfitter apprentice waiting list, none is black. (Admitted Facts, par. 10) Of the 53 persons on the refrigeration apprentice waiting list on January 7, 1970, none is black. (Pl. Ex. 176, Tr. 1128, 1130, 1773–75) Applicants for the building trades apprenticeship programs are told that there will be at least a two and a half year waiting period before they are placed as apprentices.

8. Based on the following facts, this Court finds that the J.A.T.C. gives preference to relatives and friends of persons in the trade in admitting persons to the building trades apprentice programs:

a. The apprenticeship applications used by the J.A.T.C. since at least 1963 request the applicant to indicate the occupations of his father and brothers, the names of and length of acquaintance with persons in the plumbing and pipefitting trades, the name of the person who directed the applicant to apply and the way the person became interested in the trade. (Pl. Ex. 171, Pl. Ex. 172)

b. At least 56 percent of the current building trades apprentices indicate on their applications that they have relatives in the trade, with the percentage for the steamfitter and plumber programs exceeding 63 percent. A large number of the remaining apprentices indicate on their applications that they were directed to apply by persons in the trade. (Pl. Ex. 172, 173)

c. Thirty-six percent of the applicants on the waiting list indicate on their applications that they have relatives in the trade, with the percentage for plumbers and steamfitters reaching 40 percent. A large number of the remaining applicants indicate on their applications that they were directed to apply by persons in the trade. (Pl. Ex. 183, 184)

d. The J.A.T.C. has had notice from the face of the applications that a majority of the apprentices state that they learned of the program through friends and relatives in the trade. (Pl. Ex. 172, 183) Prior to December 1969, however, the J.A.T.C.'s efforts to publicize the apprenticeship program were almost exclusively limited to efforts to recruit applicants for the marine pipefitter apprentice program. (Pl. Ex. 258, pp. 43, 62–65) The J.A.T.C. had notice that the majority of applicants for the building trades apprenticeship program stated that they learned of the program through relatives and friends of persons in the trade. The J.A.T.C. took no steps prior to December 1969 to disseminate information to other sources. The natural consequence of the J.A.T.C.'s inaction was to limit information concerning the building trades program to friends and relatives of persons in the trade.

e. The applications of 18 of the current building trades apprentices indicate on their face that the applicant was 17 or younger at the time he applied, including four which indicate the applicant was 16 and two which indicate the applicant was 15 when he applied. Sixteen of these 18 applicants indicate that the applicant had relatives in the trade. The remaining two indicate the applicant was directed to apply by persons in the trade. All of these applications indicate that the applicant applied prior to April 1969. (Pl. Ex. 172, 173)

f. The applications of 21 persons on the building trades apprentice waiting lists indicate on their face that the applicant was 17 or younger at the time he applied, including five which indicate the applicant was 16. The applications of 17 of these indicate the applicant applied prior to April 1969. Of these 17, ten indicate that the applicant had relatives in the trade, and five indicate that the applicant was directed to apply by persons in the trade. The applications of the remaining two indicate the applicants are the twin sons of a carpenter. (Pl. Ex. 183, 194)

g. The J.A.T.C. has given preference to persons who are or who indicate on their applications that they are relatives or friends of persons in the trade, by placing them directly as apprentices and by advancing them on the apprentice waiting list. For examples, Robert Lucas, former president of a large refrigeration contractor, was able to obtain special treatment for five whites who were sons or friends of his employees. (Tr. 790; Pl. Ex. 296, p. 14) The application and indenture agreement of Lonnie Boyd, a current steamfitter apprentice, indicates he both applied and was indentured on September 20, 1966. His father's occupation is listed on his application as superintendent of Midmountain Contracting and a marginal notation on his application indicates his father was known by the J.A.T.C. (Pl. Ex. 172, pp. 163–165) The application of Charles Brenner for the plumber apprentice program put the J.A.T.C. on notice that he applied on May 20, 1969 at age 20, and the Plumber Apprenticeship waiting list for June 1969 indicates he was initially placed on the list on that date and was in the 105th position. (Pl. Ex. 179) He now appears on the waiting list with the date of May 1966 and is in the 7th position. (Pl. Ex. 174) He indicated on his application that his father's occupation was plumbing. (Pl. Ex. 183, pp. 17–18)

9. The J.A.T.C. policy of granting preference to relatives and friends of persons in the trade is limited to white applicants. Robert Lucas was able on several occasions to employ as apprentices whites who were sons or friends of his employees; these persons did not have to wait their turn on the apprentice waiting list. (Tr. 783) There was only one instance where Lucas was unable to obtain this kind of preference. The applicant on that occasion was Charles Carrington, a black. (Tr. 782–83) While this incident occurred shortly before the effective date of the Civil Rights Act of 1964, there is no evidence to indicate that this preference policy has been modified.

10. Based on the following facts, this Court finds that the J.A.T.C. has discriminated, on the basis of race or color, against blacks who have sought to apply for building trades apprenticeships by failing and refusing to place their names on the waiting lists for building trades apprentice programs:

a. Robert Lucas, a white refrigeration contractor, appeared before the J.A.T.C. in February 1965, to obtain an apprenticeship for Charles Carrington, a black man who was employed by Lucas. Lucas was told that Carrington could not be advanced ahead of other applicants and that he was 26th on the list. (Pl. Ex. 197) The name of an apprentice applicant is placed in a bound record book when his application is completed. (Pl. Ex. 258, pp. 22–23) The application of Charles Carrington indicates it was completed in December, 1964 (Pl. Ex. 160); however, his name does not appear in the record book for refrigeration apprentice applicants. (Pl. Ex. 182)

b. Ray Fairman, a black man who met the qualifications for the plumber apprenticeship program, went to the J.A.T.C. office in January 1969 and asked the Coordinator, Thomas Falconer, if there was any way he could get a plumber apprenticeship. (Tr. 766–69) Falconer replied that there was no way he could get into the program. (Tr. 770) Fairman was not told he could have his name placed on the waiting list. (Tr. 771, 776–77)

c. Roy Lawson, a black marine pipefitter, was sent to Local 32 by his employer, Lockheed Shipyards, for dispatch back to Lockheed in late 1965. (Pl. Ex. 260, p. 14) A short time later, he asked at the union office if he could get into the plumber apprentice program and was told by a man at the office that his name would be placed on the waiting list. (Pl. Ex. 260, p. 17) Subsequently he checked with the office concerning his position on the list and was told he was 25th. (Pl. Ex. 260, p. 18) When he checked again in 1968 for his position, he was told there was no record of his name. (Pl. Ex. 260, pp. 18–19) His name does not appear in the record book for plumber apprentice applicants. (Pl. Ex. 180)

d. Emmett Williams, a black man, sought a plumbing apprenticeship in 1967. (Pl. Ex. 261, pp. 5, 11–12) At that time he was told by Thomas Falconer, J.A.T.C. Coordinator, that he could be dispatched immediately as a marine pipefitter apprentice, but that there were no immediate openings for plumber apprentices. (Pl. Ex. 261, p. 5) Williams was informed by Falconer that to become a plumber apprentice, he would have to have his name placed on a waiting list until an opening was available and he asked to have his name placed on that list. (Pl. Ex. 261, pp. 5, 6–7) He called on at least one occasion to see if his name was on the list, but he was never actually advised. (Pl. Ex. 261, pp. 7–8) Williams has never been contacted by the J.A.T.C. regarding his position on the waiting list (Pl. Ex. 261, p. 12) and his name does not appear in the record book for plumber apprentice applicants. (Pl. Ex. 180)

11. Laffie Sanders, a black refrigeration mechanic with over four years of refrigeration experience, applied at the Youth Opportunity Center for the refrigeration apprenticeship program in February 1968, and was told at that time there would be a two year waiting period. (Tr. 714–15) Sanders subsequently enrolled in and completed a six-month refrigeration and air conditioning course at a trade school in Los Angeles. (Tr. 716, 727) Upon completion of the course in May 1969, he returned to Seattle and appeared before the J.A.T.C. (Tr. 717) He informed the J.A.T.C. that he had over five years experience at the trade and felt qualified as a journeyman, and he asked whether he would be given credit on his apprenticeship for his five years experience. (Tr. 718) He was told that he would not, but that he could work something out with his employer. (Tr. 719) He told the J.A.T.C. he would accept an apprenticeship. (Tr. 719) The J.A.T.C. thereupon told the Coordinator, Thomas Falconer, to dispatch Sanders to an air conditioning company as an apprentice. (Tr. 719) The following day Falconer dispatched Sanders to Midmountain Construction where he was employed laying pipeline. (Tr. 719–20) A few days later, Sanders was told by the foreman that he was in the wrong place and he subsequently returned to Falconer's office. Falconer started to take Sanders back to Midmountain, but enroute he changed his mind and took Sanders to Lewis Refrigeration, but no job developed. (Tr. 720–21) Sanders had remained unemployed for about a month when Falconer, prodded by persons at the State Employment Service, offered Sanders temporary employment at the shipyards until a position was available for a refrigeration apprentice. (Tr. 720–23) Sanders accepted the offer and was dispatched to Lockheed as a marine pipefitter. He was not informed that he was to be indentured as a marine pipefitter apprentice and he did not sign a marine pipefitter indenture agreement (Tr. 725); however, soon after he left Lockheed after obtaining employment on his own, as a refrigeration journeyman, he received a marine pipefitter indenture agreement in his name from the state. (Tr. 725, 726; Pl. Ex. 159)

12. Thomas Falconer, J.A.T.C. Coordinator from 1962 through June 1969, suggested to whites in an apprentice class in the fall of 1968 that they assault two black marine apprentices. (Pl. Ex. 259, pp. 4–5)

Based upon the foregoing Findings of Fact regarding Local 32 Plumbers and Pipefitters Joint Apprenticeship and Training Committee the Court makes the following:

## CONCLUSIONS OF LAW

1. Defendant J.A.T.C. is a joint labor-management committee controlling apprenticeships within the meaning of 42 U.S.C. § 2000e–2(d).

2. The Court has jurisdiction over the subject matter of this action and the parties to it by virtue of Title VII of the Civil Rights Act of 1964. 42 U.S.C. § 2000e et seq. The Attorney General is authorized under § 707(a) of that Act to institute suit to enjoin a pattern or practice of discrimination and request such relief as may be necessary to insure the full enjoyment of rights described in Title VII. 42 U.S.C. § 2000e–6(a).

3. Defendant J.A.T.C. has pursued a pattern and practice of conduct with respect to employment opportunities in the construction industry which has denied blacks because of their race or color the same opportunities made available to whites.

## VII

## FINDINGS OF FACT APPLICABLE TO INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS, LOCAL NO. 46

1. Defendant Local Union No. 46 of the International Brotherhood of Electrical Workers is an unincorporated association of approximately 3,000 members working in the electrical industry within King, Clallam, Jefferson, and Kitsap counties in the State of Washington. Its principal office is at 2700 First Avenue, Seattle, Washington. (Admitted Facts, par. 2)

2. Local 46 is composed of eleven separate units which include workers engaged in various aspects of the electrical industry varying from construction electricians and marine electricians to electrical manufacturing workers and oil burner servicemen. (Admitted Facts, par. 3)

3. Of the nearly 3,000 members of the union, approximately 1,750 are in the Construction Wireman's Unit. The Marine Unit, representing electricians in the shipyards, has approximately 900 members. The remaining two or three hundred members are distributed throughout the other units in Local 46. (Tr. 844–45)

4. Of the nearly 3,000 members 15 are black. There are two black journeyman members in the Wireman's Unit— John Mackie, Jr. and Harold G. Wright. Mackie is classified as a juorneyman wireman and Wright as a Class D wireman. (Admitted Facts, par. 4) John Mackie was a member of an out of town I.B.E.W. local before he became a member of Local 46. (Pl. Ex. 271, p. 74) Harold Wright was required to join Local 46 as a Class D wireman in August 1968 when his employer signed a collective bargaining agreement with the union and became a union contractor. (Tr. 866–67)

There are 13 blacks represented by the Marine Unit. They are: Charles Alford, Frank Alexander, William Character, Henry Lee Collins, Samuel Cherry, Willie Crawford, Joshua Gardner, R. J. Hampton, William R. King, Arthur D. Pearson, Tommy L. Stearn, H. E. Stone, and Herman Williams. (Admitted Facts, par. 5)

5. Gordon Puckett was employed by Local 46 as a business representative from 1956 until 1965. In 1965 he became business manager and has continued in that position up to the present time. (Pl. Ex. 271, pp. 2–3) Edward Olson was president of Local 46 from 1960 through 1964, (Pl. Ex. 270, p. 3) and from 1966 to the present has been employed as a business representative by the union. (Admitted Facts, par. 8) Andrew Smith has been employed as a business representative by Local 46 from 1965 to the present. (Admitted Facts, par. 8)

6. Local 46, pursuant to collective bargaining agreements with electrical contractors, maintains an exclusive hiring

hall for the referral of construction electricians (wiremen) to employers. Contractors must call the union when electricians are needed, and in the event that the union cannot fill the request within 48 hours the contractors may hire on their own. Employees hired directly by the contractors when the union is unable to supply men are classed as "temporary employees" and may be replaced when the union is again able to refer electricians. (Pl. Ex. 203, pp. 44–46)

7. Through the operation of its hiring hall the union effectively controls a substantial portion of employment opportunities for construction wiremen. (Admitted Facts, par. 7) This includes about 90 percent of residential electrical work done within the union's jurisdiction. (Pl. Ex. 271, p. 13)

8. The construction hiring hall operates in the following manner:

a. Electricians desiring work complete a work registration card at the union hall. Each man is given a card corresponding to one of four priority groups. The evidence regarding what criteria are required to qualify for each group is ambiguous. The criteria as set out in Local 46's collective bargaining agreement is as follows:

"Group I—All applicants for employment who have four or more years' experience in the trade, are residents of the geographical area constituting the normal construction labor market, have passed a journeyman's examination given by a duly constituted Local Union of the I.B.E.W. and who have been employed for a period of at least one (1) year in the last four (4) years under a collective bargaining agreement between the parties to this addendum.

Group II (a) All applicants for employment who are residents of the State of Washington and who have four (4) or more years' experience in the trade and who have passed a journeyman's examination given by a duly constituted Local Union of the I.B.E.W. in the State of Washington.

(b) All applicants who have four or more years' experience in the trade and who have passed a journeyman's examination given by a duly constituted Local Union of the I.B.E.W. who reside outside the State of Washington.

Group III—All applicants for employment who have two (2) or more years' experience in the trade, are residents of the geographical area constituting the normal construction labor market and who have been employed for at least six (6) months in the last three (3) years in the trade under a collective bargaining agreement between the parties to this addendum.

If the registration list is exhausted and the Union is unable to refer applicants for employment to the Employer within forty-eight (48) hours from the time of receiving the Employer's request, Saturdays, Sundays, and Holidays excepted, the Employer shall be free to secure applicants without using the Referral Procedure, but such applicants, if hired, shall have the status of 'Temporary Employees'. The Employer shall notify the Business Manager promptly of the names and social security numbers of such temporary employees, and shall replace such temporary employees as soon as registered applicants for employment are available under the referral procedure." (Pl. Ex. 203, pp. 45–46)

Local 46's business manager's description of the criteria would indicate that less strict procedures are employed.

Group I—Journeyman wiremen members of Local 46.

Group II—"Travelers" or journeyman wiremen members of out of town local unions of the I.B.E.W.

Group III—Members of Local 46 with any classification other than journeyman wireman.

Group IV—Any individual with one year's electrical experience.

(Pl. Ex. 271, pp. 14–15)

b. The cards are then placed in an "out of work" rack according to priority group and date of registration within that group. In response to contractors' requests for men the union offers referral, or the opportunity to take a particular job, first to those in Group I in order of their places on the out of work rack and then in the same manner successively to those in Group II, then Group III, and finally Group IV. (Pl. Ex. 203, p. 47)

c. A man may be referred out irrespective of his group or priority within that group if an employer calls for him by name to work as a foreman. A man may also be referred irrespective of his place on the out of work list if such individual is called for by name and has within the preceding 90 days worked for the contractor requesting him. (Pl. Ex. 271, pp. 22–23)

d. Applicants for work have to be physically present in the union hall to be referred to work. (Pl. Ex. 271, p. 21) If a man accepts a job his card remains in the rack for the following three days so that he does not lose his place on the out of work list in the event that he is laid off within that three day period. If a man accepts a residential or house wiring job his card remains in the rack for ten days. (Pl. Ex. 271, pp. 23–24)

9. The exclusive hiring hall for construction wiremen, as described in paragraph 8, has been operated by Local 46 since at least 1959. (Pl. Ex. 271, p. 40)

10. Local 46, pursuant to collective bargaining agreements with the shipyards, maintains a hiring hall for the referral of men to work as marine electricians. (Pl. Ex. 202) The marine hiring hall is operated on a nonexclusive basis so that a man may be either referred out by the union or hired directly by the shipyards.

a. To qualify for referral under union procedures a man must have had some prior electrical experience but not necessarily one year of such experience. Such individual either signs the out of work book for marine electricians or speaks to the union representative in charge of the shipyards. If work is available he will be sent out to the job. (Pl. Ex. 271, pp. 59–61)

b. An individual may also make direct application to a shipyard and be hired as an electrician. The company must then notify the union that a man has been hired. (Pl. Ex. 271, pp. 59–61)

11. An electrician need not be a member of Local 46 or any other union in order to be eligible for work referral as a construction wireman or marine electrician. A man seeking work who is not a union member is interviewed by a business representative who determines his qualifications based on previous experience. No proof of prior experience is necessary unless it is determined after a casual interview and "looking him right square in the eye" that an applicant is not telling the truth about his background. (Pl. Ex. 271, pp. 16–18)

12. If an individual applying for work has had at least one year of experience he is told to fill out the necessary forms for work referral and is given a Group IV registration card which is then immediately placed in the construction wiremen out of work rack. (Pl. Ex. 271, pp. 16–17)

13. Once an electrician is referred out to work he may join the construction wireman's unit, as a Class D wireman, by making application and paying an initiation fee. After joining the practice is that he is then eligible to be placed in Group III when next seeking construction referral. (Pl. Ex. 271, p. 34; Pl. Ex. 203, pp. 45–46)

14. To obtain classification as a journeyman wireman member in the construction unit of a union an individual must pass a journeyman's examination administered by the union. Journeymen wiremen are eligible for Group I status under the work referral system. (Pl. Ex. 270, p. 13)

15. The Executive Board of Local 46 grants permission to individuals to take the journeyman's examination. There are no established guidelines for grant-

ing such permission other than a consideration of an applicant's past experience. (Pl. Ex. 271, pp. 32–33) Oral examinations are administered to illiterate persons. (Pl. Ex. 271, pp. 80–83)

16. Individuals who are employed as marine electricians in the shipyards are required to join the marine unit of Local 46 within 30 days of the date of their employment. (Pl. Ex. 271, p. 59)

17. Marine electricians are paid at the rate of $4.15 an hour. (Pl. Ex. 202, p. 38) Construction wiremen are paid $6.75 an hour. (Pl. Ex. 203, p. 16) Consequently marine electricians quite often seek construction referral. When doing so they are placed in Group III or Group IV. (Tr. 1717–18)

18. Based on the facts in paragraphs 19–24, this Court finds that Local 46 has discriminated against blacks on the basis of their race or color by failing to inform them of correct procedures for membership and work referral; by failing to allow them to apply for membership and work referral; and by refusing to refer blacks to work.

19. Alvin George is a qualified black electrician with 18 years of experience including one year of electrical engineering in college. (Tr. 885–87)

a. In March 1960, George went to the offices of Local 46 seeking employment and membership. He was told that he would first have to go through the union apprenticeship program before he could join the union. (Tr. 889–90) George was told this despite the fact that only one year of electrical experience is required by the union for work referral. (Pl. Ex. 271, p. 15)

b. In April 1963 George again sought employment and membership at Local 46 and was again told that he would first have to go through the apprenticeship program. (Tr. 891–92) Contrasted at this time with the experience of Alvin George is that of William C. Gunlock. Gunlock sought to join the union as a journeyman wireman. He was told by the union that he could apply after the union had dispatched him to a job. (Pl.

Ex. 233) Gunlock was dispatched by the union to two construction jobs on March 1, 1963 and May 23, 1963. (Pl. Ex. 235) On July 16, 1963 Gunlock was given permission to take the journeyman wireman's examination. (Pl. Ex. 234) William C. Gunlock is white and was initiated as a member of Local 46 on February 13, 1964. (Admitted Facts, par. 9)

c. In February 1966, George again sought employment through Local 46. He was told that the union had men out of work and that "there wasn't a chance of being referred out." (Tr. 895) The Construction Wireman's Unit minutes for January, February and March of 1966 disclose that work conditions were very good. (Pl. Ex. 221, 222, 223)

20. Harold Wright is a qualified black electrician with 12 years experience including three years of formal schooling in electricity. (Tr. 854–56)

a. The Business Manager of Local 46 has testified to the effect that a man who comes in the office and is not a member of the union is "counseled" by the union to determine his qualifications and experience. If he has at least one year of experience he is given the proper forms to fill out for work referral and is immediately put on the out of work list. (Pl. Ex. 271, pp. 16–18) In March 1967, Wright went to Local 46 to see about joining the union in order to get a higher paying job. (Tr. 857) At that time he had a very brief conversation with a union representative and received no information about either membership or work referral. (Tr. 860–62, 875)

b. Wright again went to the union in October 1967, and received no satisfactory information about membership or work. (Tr. 863–65, 875) Minutes of the Wireman's Unit for August and September 1967 reveal that work was very good and that some job requests were almost impossible to fill. (Pl. Ex. 227, 228)

21. Tommy Stearn is a qualified black electrician with 17 years of experience including two years of college training in electricity. (Tr. 876–77)

In November or December of 1968 he sought referral by Local 46 to Todd's Shipyard as a marine electrician. He was denied dispatch by the union because he did not have "proof" that he was an electrician. His offer to supply the names of former employers was deemed insufficient. (Tr. 880–81) In contrast, the Business Manager testified that any type of electrical experience was sufficient for marine referral (Pl. Ex. 271, pp. 60–61) and that substantiation of such experience usually comes from merely talking to the man. (Pl. Ex. 271, p. 18) Also, work was in fact plentiful in November 1968, and the union was unable to fill job requests. (Pl. Ex. 219)

22. Cornell Huggins is a qualified black electrician with 15 years of experience including 10 years as an electrician in the Navy. (Pl. Ex. 266, pp. 4–7)

Huggins sought work as an electrician through Local 46 in March or April of 1965. He was asked by a union representative whether he had served an apprenticeship. He replied that he had not but that he did have a resume of his experience with him. The union then told him that a lot of people were out of work and that there were no openings. The work referral system was not explained to him and he did not sign an out of work list. (Pl. Ex. 266, pp. 9–11) Union minutes for March 1965 reveal that work conditions for the most part were good (Pl. Ex. 213) and the business manager testified that any electrical background, including military service experience, was sufficient to qualify one for work referral. (Pl. Ex. 271, pp. 60–61)

23. Willie Dones is a qualified black electrician with over 20 years experience including nine years as a chief electrician in the Merchant Marine. He is currently an electrical contractor in the City of Seattle. (Pl. Ex. 267, pp. 4–6) Dones visited Local 46 in 1962 seeking work and was told that none was available. (Pl. Ex. 267, p. 11) Union records for the period disclose that work conditions were generally good. (Pl. Ex. 204–209)

24. Cliff Evans is a qualified black electrician who obtained his experience by working in his father's electrical contracting firm. (Pl. Ex. 263, pp. 8–9) Evans sought work through Local 46 several times in 1965. He was at first ignored and then told that he would have to go through the apprenticeship program. (Pl. Ex. 263, pp. 18–23) At no time was he told of the work referral system or allowed to have his name placed on the out of work list. (Pl. Ex. 263, pp. 44–45)

25. Based on the facts in paragraphs 26–28, the Court finds that Local 46 has discriminated against black marine electricians on the basis of their race or color by failing to inform them of the correct procedures for obtaining construction referral; by applying different and more stringent standards to them than are normally applied to whites seeking construction referral; and by refusing to refer blacks to higher paying construction work.

26. Arthur Pearson is a qualified black electrician. In late 1965, while employed at General Electric as an electrician, Pearson visited Local 46 for the purpose of joining the union as a journeyman in order to be able to work at high paying construction jobs. He was channelled by the union to seek work in the shipyards as a marine journeyman, though he had expressed no interest in marine work. The difference between a marine journeyman and a journeyman wireman was not explained to him. Following the union's advice, Pearson obtained a job on his own in the shipyards, and became a marine electrician member of Local 46. He was later told by the same union representative who directed him to the shipyards that he would have to work for five years as a marine electrician before he would be eligible to do construction work. (Tr. 931–34) A past president of the union and current business representative testified that he had never heard of such a five year requirement as a prerequisite of being able to do construction work. (Pl. Ex. 270, p. 21) Minutes of the regular union meeting for December 1965 indicate that at the time Pearson sought work there

was a need for electricians in the construction wiremen's unit. (Pl. Ex. 215)

27. Enous Jacobs is a qualified black electrician with 15 years experience including two and one half years of formal schooling in electricity. (Pl. Ex. 264, p. 5) Jacobs worked as a marine electrician at the shipyards and was a member of Local 46's marine unit. He sought referral to higher paying construction jobs in the summers of 1966, 1967 and 1969, as was the normal practice for marine electricians, and was told by a union representative that he would need letters of recommendation from electrical contractors before he could be referred. Jacobs was never referred by Local 46 to a construction job. (Pl. Ex. 264, pp. 6–10) In contrast to what Jacobs was told, union business representatives testified that marine electricians are often referred to construction jobs and that qualification for referral is determined by checking a work record kept by the union on all its members or an applicant's dues receipt. (Tr. 1717–19; Pl. Ex. 270, p. 11)

28. Charles Alford is a qualified black electrician and a marine member of Local 46. Alford sought construction referral in the summer of 1969 and was told by a union representative that no jobs were available. He was not told of the out of work list nor was he permitted to have his name placed on it. (Pl. Ex. 268, pp. 43–48) As a marine electrician Alford was eligible to be placed in Group III or IV for construction referral. (Tr. 1717–18) During the summer of 1969, 143 electricians in Group III and 100 in Group IV were referred to construction work. (Admitted Facts, par. 10)

29. Based on the facts in paragraphs 30–31, the Court finds that blacks have been excluded from work opportunities by Local 46 and as a result have been able to obtain work only by going outside of the normal hiring practices in the electrical construction industry.

30. Alvin George, *supra* paragraph 19, obtained a job with a union electrical construction contractor in August 1969 by applying directly to the contractor. He was then sent by the contractor to Local 46 to be referred back. (Tr. 897–99) This kind of direct hire is not the normal method followed by union contractors in obtaining construction men. (Pl. Ex. 270, p. 5)

31. Harold Wright, *supra* paragraph 20, obtained employment with a union electrical construction contractor only by applying directly to that contractor in November 1969, and then being called by name as a foreman by the contractor. (Tr. 913)

32. D. W. Close Company, a large electrical construction firm which has employed up to 225 electricians, generally obtains its men through Local 46 and has never in 23 years had a black electrician referred. (Tr. 923–26)

33. Cochran Electric Company, a large electrical construction firm which has employed up to 200 electricians, has in 14 years had only two black journeyman electricians dispatched to it by Local 46. They are John Mackie and Harold Wright. Wright was called for by name as a foreman by Cochran. (Tr. 912–13)

34. Local 46 permits students to work during the summer months as temporary employees. (Pl. Ex. 271, p. 69) In granting such approval Local 46 gives preference to sons of union members. (Pl. Ex. 231)

35. Alvin George, *supra* paragraph 19, is not a member of Local 46. (Tr. 898) He was told by a union representative on February 23, 1970 that he could request permission from the union to take the examination for journeyman wireman membership if he would wait one year. (Tr. 901)

36. Beginning in 1965 and continuing through 1969, work conditions in the electrical construction industry were good and jobs for construction electricians were generally available. The peak period of employment for electricians was in 1968. (Tr. 911–12, 925)

Based upon the foregoing Findings of Fact regarding the International

Brotherhood of Electrical Workers Local No. 46 the Court makes the following:

## CONCLUSIONS OF LAW

1. Local 46 is a labor organization within the meaning of 42 U.S.C. § 2000e (d) and is engaged in an industry affecting commerce within the meaning of 42 U.S.C. § 2000e(e).

2. The Court has jurisdiction over the subject matter of this action and the parties to it by virtue of Title VII of the Civil Rights Act of 1964. 42 U.S.C. § 2000e et seq. The Attorney General is authorized under § 707(a) of that Act to institute suit to enjoin a pattern or practice of discrimination and request such relief as may be necessary to insure the full enjoyment of rights described in Title VII. 42 U.S.C. § 2000e–6(a).

3. Defendant Local 46 has pursued a pattern and practice of conduct with respect to employment opportunities in the construction industry which has denied blacks because of their race or color the same opportunities made available to whites.

## VIII

## GENERAL FINDINGS OF FACT APPLICABLE TO DEFENDANTS

■ 1. The City of Seattle is the single largest population and commercial center within the jurisdiction of defendant unions and apprenticeship committees. The main offices, hiring halls and schooling and training facilities of the defendants are located in the city. Approximately 42,000 blacks reside in Seattle, comprising over seven percent of the city's population.

2. Defendants have a reputation in Seattle's black community of discriminating against blacks on account of their race or color with respect to employment opportunities in the construction industry. (Tr. 16–19; Pl. Ex. 256, p. 10; Pl. Ex. 239, p. 28) It is a reasonable inference, and the Court finds, that this generally poor reputation has adversely affected the number of black applicants for membership, referral and apprenticeship.

3. Each defendant apprenticeship committee solicits information from prospective applicants by use of an application form which is drawn up by each apprenticeship organization. These application forms are attached to the applicants' indenture agreements if the applicants are accepted into the apprenticeship programs. The Court finds that the information solicited by the committees and contained upon the forms is consulted and acted upon by the committees in making determinations regarding the acceptability of applicants for apprenticeships.

4. The evidence has established that in the past a large part of the job skills required of members of defendant unions has been, and the Court finds that they still can be, learned by on the job training.

5. Defendant apprenticeship committees are bodies legally separate and distinct from their respective unions. The Court finds, however, that the unions are at least partially responsible for the discriminatory racial policies of their respective apprenticeship committees. In practical effect the unions' policies and practices have established the framework within which the apprenticeship committees have worked. Union influence has been further supplemented by equal representation on each committee, by physical proximity to apprenticeship offices, and by varying degrees of control over the day to day operation of committee functions.

The fact that defendant unions are partially responsible for the discriminatory behavior of the apprenticeship programs is one of the factors the Court has considered in concluding that Ironworkers Local 86, Plumbers and Pipefitters Local 32 and Sheet Metal Workers Local 99 have pursued a pattern and practice of discrimination against blacks. The Court would make it clear, however, that it would arrive at the same conclu-

sion had it not considered this overlapping a factor.

6. On the eve of this lawsuit and during its pendency the Seattle Building and Construction Trades Council, an organization which is chartered by the Building Trades Department of the AFL–CIO and of which defendant unions are members, has on behalf of defendant unions and other building trades unions negotiated with the Department of Labor, contractors' associations, and certain representatives of the black community concerning the problem of assuring to blacks equal employment opportunities in the construction industry. These negotiations have failed to bring about a mutually satisfactory solution. (Tr. 1254–1269H)

In addition to these efforts, the Seattle Building and Construction Trades Council and several of the defendants in this suit have made unilateral efforts to provide new opportunities for blacks and other minority persons to enter into the construction divisions of defendant unions. The Court finds that these commendable efforts have been made in good faith, but it is unable to find that these efforts alone will prevent a recurrence of some of the discriminatory practices of the past or will adequately remedy the present effects of those practices.

7. The evidence brought out during the trial of this case was limited exclusively to the problems which persons of the Negro race have experienced in trying to obtain equal employment opportunities through defendant organizations. The Court is in no position to intimate a view regarding the problems or lack thereof which members of other minority backgrounds may have experienced.

8. Several times during the course of the findings of fact set out above, the Court has prefaced a finding by a statement "based upon the following facts the Court finds * * *" or words to that effect. In doing this, the Court has not intended to exclude all evidence except that specifically set out to support the general finding of fact. The evidence specifically set out was selected because it was considered the most salient and probative. By employing this approach, however, the Court did not mean to exclude other uncontradicted evidence which tends to support the general finding.

9. In conjunction with the findings of fact and conclusions of law filed today. in this case, the Court may file a memorandum providing some background and comment in support of the Court's findings and decision herein. Insofar as that memorandum may contain any findings of fact, they may be considered as supplemental to the findings of fact herein.

## IX
## CONCLUSIONS OF LAW

From the foregoing Findings of Fact the Court makes the following general Conclusions of Law:

1. It is an unlawful employment practice for a labor organization (hereinafter referred to as a "union") to exclude persons, because of race or color, from union membership or from participation in a job referral system operated by the union.

2. It is an unlawful employment practice for a joint labor-management committee controlling apprenticeship training to discriminate against persons because of their race or color in admission to apprenticeship training programs.

3. Where union membership is virtually all white, it is unlawful for a union and its apprenticeship committee to limit information with regard to membership, work referral opportunities, and apprenticeship training to union members and other whites.

4. It is unlawful for a union and its apprenticeship committee to give false, misleading or incomplete information to blacks because of their race, or to fail or refuse to inform them of the

procedures for application for membership, referral or apprenticeship training.

5. It is unlawful for a union or its apprenticeship committee to apply to blacks on account of their race higher standards or more stringent procedures than are applied to whites.

6. It is unlawful for a union or apprenticeship committee actively to attempt to recruit whites while making no effort to recruit blacks.

7. It is unlawful for virtually all white unions and apprenticeship committees to give preference to relatives of union members and union contractors in admission to training programs or work referral when such a preference operates to restrict the employment opportunities of blacks.

8. Where a union which has engaged in racially discriminatory practices exercises substantial control over construction job opportunities, it cannot require of blacks as a condition of referral or membership, experience in the industry or under a collective bargaining agreement. Since the union has deterred blacks from acquiring such experience, to condition referral or membership on such experience or to grant referral priority on the basis of such experience would carry forward the effects of past discrimination.

9. Qualifications, examinations and other tests required by a union or joint apprenticeship committee for membership, work referral, or apprenticeship training must bear a reasonable relationship to skills required on the job. Such qualifications and skills need not include the full range of abilities within a craft, but need only be on a level with the knowledge or skill comparable with qualifications and skills generally demonstrated by white applicants or members; prior employment as a journeyman shall be prima facie evidence of journeyman capability.

10. In proving a pattern or practice of racial discrimination, evidence of the discriminatory reputation of a union and its joint apprenticeship program is relevant and admissible. Such evidence is admissible to show how and why blacks may have been discouraged from applying for membership, referral or apprenticeship, and how and why some of those who did apply may have been discouraged from pursuing their applications vigorously. It is also admissible because it has a direct bearing on the nature and extent of the appropriate relief to which the Government is entitled.

11. Statistical evidence regarding the racial composition of the defendant organizations and the community at large is probative of the issue of whether defendants have pursued a policy of racial discrimination. This is especially true when it has been shown that qualified blacks have been and continue to be residents of the area.

12. For purposes of this action, evidence of defendants' discriminatory practices occurring before the effective date of the Civil Rights Act of 1964 is admissible to show:

    a. whether the intent, purpose and effect of defendants' present policies perpetuate the effects of past discrimination, and

    b. what relief is appropriate to correct the effects of past discrimination and to avoid future discrimination.

13. The apprenticeship application forms are admissible as evidence of the type of data which is of interest to the apprenticeship committee and to indicate what information the committee had before it when it acted upon the application. The applications are not admissible to establish that the information given by the applicant on the forms are true statements.

14. Where a defendant has engaged in a pattern or practice of discrimination on account of race, such defendant must not only refrain from future discrimination but must also undertake whatever affirmative action

may be necessary to assure those discriminated against the full enjoyment of their right to equal employment opportunities.

15. Based upon the foregoing findings of fact and conclusions of law, an adequate decree shall forthwith be entered enjoining the unlawful practices heretofore engaged in by the defendants and directing insofar as the law will permit such modifications of collective bargaining agreements and union membership, work referral and apprenticeship requirements and procedures as may be necessary to overcome the present effects of past discrimination and to provide blacks equal access with whites to employment opportunities.[1]

## JUDGMENT AND DECREE NO. 1 REGARDING THE STANDARDS AND PROCEDURES RELATING TO UNION REFERRAL AND MEMBERSHIP

1. Defendant local unions, their officers, agents, employees, successors and all persons in active concert or participation with them in the administration of defendant local unions shall:

a. Not discriminate, with respect to acquisition or retention of membership in such local unions or with respect to referral for employment, against any person because of his race or color;

b. Not cause, authorize, encourage or financially support any refusal to work by their members, tacitly or otherwise, where the purpose of such refusal to work is to obtain an objective prohibited by the terms and objectives of this Order;

c. Administer their affairs so as to provide opportunities for membership and employment to blacks which are equal to those provided whites.

*Records and Record Keeping:*

2. After July 15, 1970, Defendant Locals shall require all persons who enter their offices seeking employment to sign a serially numbered bound register, giving their name, race, the date of registration, the classification of the various skills which they possess (for example for Local 86: structural, rodman, welder), and union affiliation (if any). Defendant Locals shall require all persons who enter their offices seeking employment to complete and file with the union an application for referral. In each case, such application shall be serially numbered and contain at least the name, address, telephone number, age, race, union affiliation (if any) and summary and explanation of the applicant's experience in the particular union's trade or any related trade. The application shall then become a permanent part of the applicant's file, and shall be updated, if necessary, upon each subsequent request for referral by the applicant. Defendant Locals shall place on their out of work lists and refer to work only those persons who have on file such an application and have signed the referral register.

3. After July 15, 1970, Defendant Locals' application forms for membership shall contain at least the following information: name, address, race, date of application, classification of each applicant for membership, and the action taken with respect to him. They shall maintain records containing all applica-

---

[1]. The reference to "blacks" is not intended to exclude other minority persons from equal access with whites to employment opportunities. However, the evidence adduced in this case has been limited to the problem of discrimination against blacks. The order hereinafter entered shall be correspondingly limited to remedying that discrimination. The Court would note, however, that Title VII of the Civil Rights Act of 1964 is broader in purpose and scope than the protec-

tion of the black race alone. Title VII protects all persons from discrimination based upon their race, color, religion, sex or national origin. In the event that other minority persons may have been or are being discriminated against, the Court would expect defendants to take whatever steps as may be necessary to rectify that discrimination and to afford those individuals or groups equal employment opportunities in accordance with the law.

tions for membership, copies of all notices sent to applicants, copies of any replies received from applicants, and all other material pertaining to applicants for membership.

4. Beginning October 1, 1970, and every three months thereafter, Defendant Locals shall transmit to the Plaintiff the following records:

a. copies of all referral applications filed within the reporting period;

b. copies of all hiring hall dispatch slips issued during the reporting period, said dispatch slips shall reflect the race of the individual and the priority group from which he was referred;

c. copies of all health and welfare reports received during the reporting period;

d. copies of termination slips received from all employers during the reporting period;

e. in the case of a black applicant who is not placed on the out of work list or who is not referred for work, Defendant Locals shall report his name, address, telephone number and reason why he was not placed on the out of work list or referred to work;

f. copies of membership applications filed during the reporting period and a list of the names of all new members initiated during the reporting period;

g. copies of the serially numbered registers provided for in this Order, reflecting the information therein contained for the preceding three month period.

Plaintiff shall review this data every six months and submit to the Court and the interested local a statistical summary thereof with such analysis and comments as may be relevant to the terms and objectives of this Order.

5. Each Defendant Local shall maintain a serially numbered bound register—called the Contractors' Register—of all requests by contractors for each trade classification of employees. The register shall contain the name of the contractor, the date and time of the request, the name of any employee specifically requested, the number of employees requested, the special skills (if any) required, and the names, race, union affiliation and classification (if any), and dates and times of referral of those persons sent to fill the request.

6. All records relating to applications for membership—including membership examinations, if given—and the referral of applicants to work shall be maintained and made available for inspection and copying by the Plaintiff at reasonable intervals during regular business hours or at other mutually convenient times without further order of this Court.

*Dissemination of Information:*

7. Defendant Locals shall prepare a brief written statement describing the operation of their referral systems and their membership requirements for blacks. The various employment opportunities also shall be briefly described and the current rate of pay set forth. The statement shall also indicate that union membership is not a requirement of initial referral. A copy of the statement shall be furnished to the Plaintiff and each black applicant for employment.

8. Once a month for six months following entry of this Order, and quarterly thereafter, Defendant Locals shall place advertisements in newspapers identified with serving the black community, describing the work opportunities available through Defendant Locals, the procedures for obtaining such opportunities, and stating that such opportunities are offered on a nondiscriminatory basis. Copies of such advertisements along with date of publication and the identity of the newspaper shall be furnished plaintiff United States.

9. Before July 15, 1970, Defendant Locals shall forward to the organizations listed in Exhibit A of this Order a copy of the statement required under paragraph 7 hereof, a copy of their constitutions and bylaws, a copy of their current collective bargaining agreements and a copy of this Order. Further notice shall

be sent these organizations whenever necessary in order to keep the information available to these organizations current. Information shall also be sent to these or any other organizations upon request by the organization.

10. Defendant Locals shall continue to participate in and financially support the Seattle Building Trades Council "Outreach Program." In the event the United States Department of Labor funds the aforementioned "Outreach Program" the Defendant Locals shall participate in good faith in the implementation of such program.

*Retention of Jurisdiction:*

11. The Court shall retain jurisdiction of this case for such further relief as may be necessary or appropriate to further effectuate equal employment opportunities. At any time after June 30, 1973, Defendant Locals or Plaintiff may move this Court, on due notice, for termination of this Order or such modification as may be warranted under the circumstances then existing.

*Costs:*

12. Since the application of this Order is substantially prospective, the matter of costs is reserved and may be brought on with such motions as might be made under paragraph 11, above, or at such other time as may be considered appropriate.

## PROVISIONS RELATING ONLY TO LOCAL 86

*Membership Application Procedures:*

13. Local 86 shall offer journeyman membership in the appropriate union membership classification to blacks possessing the following qualifications, union constitutions and bylaws notwithstanding:

a. *Welders*—700 hours of construction welding experience and possession of a City of Seattle Welders Certificate and payment of the standard initiation fee.

b. *Rodmen*—700 hours of rod work experience and payment of the standard initiation fee.

c. *Structural Men*—700 hours of structural ironwork experience and payment of the standard initiation fee.

The "standard initiation fee" which may be charged as to blacks shall be no higher than that amount which is the average between the initiation fee charged upon July 2, 1965 and the initiation fee charged upon the effective date of this Order. Payment shall be on the most favorable terms afforded by the local within the past five years.

14. Black applicants for membership in Local 86 shall not be required to provide names of union members who will vouch for them, nor shall it be necessary that they pass any examination as a prerequisite of membership.

*Journeyman Referral Procedures:*

15. If Local 86 continues to use priority groupings in the operation of its hiring hall, black applicants for referral, irrespective of membership status, shall be referred for employment by Local 86 within the appropriate priority group warranted by the applicant's experience. "Experience" shall include experience as an employee of a nonunion shop, self-employment in any aspect of the trade, or any other employment reasonably related to the ironwork trade, including experience gained in the Armed Services.

16. Persons shall be referred out of the first priority group in chronological order of their date of placement on that list, and then, after the names of the first priority group are exhausted, in the same manner out of the second priority group and so forth through each priority group. If Local 86 chooses not to retain a priority grouping system, all referrals shall then be made on a first-in first-out basis. In any event Local 86 shall inform Plaintiff within ten days of any referral system which it adopts or informally employs that varies from the one instituted by Local 86 on March 1, 1970.

17. The union, shall not require an examination or previous experience under the collective bargaining agreement as prerequisites to the placement of a black applicant's name on the out of work list or his referral to work. An applicant's own statement on an application for referral shall be sufficient evidence as to previous experience. The union shall retain the right to verify any relevant statements made.

18. Because black journeymen generally have been denied the opportunity to acquire prior work experience with contractors and apart from whatever other right contractors may currently have to call a person out of order, blacks may be called for work by a contractor irrespective of their place on the out of work list or prior experience with a particular contractor.

*Specific Relief:*

19. Local 86 shall not later than July 15, 1970, contact by certified mail the individuals listed in Exhibit B and offer them immediate referral in response to any of the next three contractor requests for employees following their indication to the union that they desire referral. Local 86 shall also explain the membership requirements as set out in paragraphs 13 and 14 above.

20. Local 86 shall transmit to the United States copies of all letters sent pursuant to paragraph 19 within three days after sending same and, as soon as reasonably possible, a report detailing the response of the individuals contacted.

## PROVISIONS RELATING ONLY TO LOCAL 32

*Membership Application Procedures:*

21. Local 32 shall offer journeyman membership in the appropriate building trades membership classification to blacks who meet the following requirements:

a. Three years of experience in the plumbing and pipe fitting trade. "Experience" includes experience as an employee of a nonunion shop, self-employ-

ment as a plumbing, steam fitting or refrigeration contractor, employment as a marine pipe fitter or pipe welder, and any other employment reasonably related to plumbing, steam fitting, refrigeration or pipe welding construction work, including experience gained in the Armed Services.

b. Submission of letters from past employers of the applicant or persons having knowledge of the applicant's experience, showing at least three years' experience in the trade.

c. Successful completion of the journeyman examination offered by Local 32 for the classification for which the applicant applied.

d. Payment of the standard initiation fee for journeyman membership.

As to blacks, the standard initiation fee which may be charged shall be no higher than that amount which is the average between the initiation fee charged on July 2, 1965 and the initiation fee charged upon the effective date of this Order. Payment shall be on the most favorable terms afforded by the local in the past five years.

22. Local 32 shall offer examinations for direct journeyman membership at least once every four months whenever there are applicants for journeyman membership. Each applicant shall be given at least one month's written notice of the date and place of examination, the nature and general description of its content and/or copies of last two prior written examinations, and the names of any texts or other material which might be particularly helpful in preparing for the examination. Any examination given shall be no more stringent than those given by Local 32 in the past five years.

23. Local 32 shall not alter or change the employment or referral rights of a black applicant because of such applicant's failure to achieve a passing grade on the membership examination.

*Journeyman Referral Procedures:*

24. All blacks who have a minimum of two years experience in the plumbing

and pipe fitting trade shall, depending upon the general occupational residence requirements of the union, be assigned to the appropriate priority group and be referred on that basis. Eligibility for membership shall not be a prerequisite for referral. "Experience" shall include experience as an employee of a nonunion shop, self-employment as a plumbing, steam fitting or refrigeration contractor, employment as a marine pipe fitter or pipe welder, or any other employment reasonably related to plumbing, steam fitting, refrigeration or pipe welding construction work, including experience gained in the Armed Services. An applicant's own statement on an application for referral shall be sufficient evidence as to previous experience. The union shall retain the right to verify any relevant statements made.

25. Persons shall be referred out of the "A" list in chronological order of their date of placement on that list and then, after names on the "A" list are exhausted, in the same manner the "B" list, and finally the "C" list. Persons may be referred out irrespective of their place on the out of work list in response to a contractor's request for such a person provided he has worked for that contractor within the preceding 90 days. Because black journeymen have been denied the opportunity to acquire prior familiarity and experience with contractors, the proviso contained in the preceding sentence shall not apply to black journeymen. Contractors may also request any individual by name to fill a foreman's job or other job requiring specialized skills.

*Specific Relief:*

26. Local 32 shall not later than July 15, 1970, contact by certified mail the individuals listed in Exhibit C and those black members and applicants working in non-construction classifications and offer them immediate construction referral in response to any of the next three contractor requests for employees following their indication to the union that they desire construction work re-ferral. Local 32 shall also explain its membership requirements to those persons not already members and offer such individuals the opportunity to apply for admission to membership.

27. Local 32 shall contact Lionel Hampton and offer him immediate referral as a marine pipe fitter. His application for membership shall be reinstated should he so desire.

28. Local 32 shall transmit to the United States copies of all letters sent pursuant to paragraphs 26 and 27 within three days of sending same and a report, as soon as reasonably possible, detailing the response of the individuals contacted and whether or not they were referred to work, and if so, when and to which contractor.

PROVISIONS RELATING ONLY TO SHEET METAL WORKERS 99

*Membership Application Procedures:*

29. Local 99 may require of blacks applying for building trades journeyman membership requirements no more stringent than the following:

a. two years of experience in the sheet metal trade, or in another trade utilizing skills applicable to the sheet metal trade, including experience as an employee of a union or nonunion shop; self-employment in the sheet metal trade; employment as a marine sheet metal worker; or other employment reasonably related to the sheet metal trade, including experience gained in the Armed Services;

b. successful completion of the journeyman examination offered by Local 99 for the classification for which the applicant applied; and

c. payment of the standard initiation fee for journeyman membership.

As to blacks, the "standard initiation fee" which may be charged shall be no higher than that amount which is the average between the initiation fee charged upon July 2, 1965 and the initiation fee charged upon the effective date of this Order. Payment shall be on the

most favorable terms afforded by the local in the past five years.

30. Local 99 shall offer examinations for direct journeyman membership at least once every four months at Seattle Community College whenever there are applicants for journeyman membership. Each applicant shall be given at least one month's written notice of the date and place of examination, the nature and general description of its contents and/or copies of the last two thereof, and the names of any texts or other materials which would be particularly helpful in preparing for the examination. Any examination given shall be no more stringent than those given by Local 99 in the past five years, and the accepted passing score for blacks shall be no higher than accepted passing scores for whites in the past five years.

31. Local 99 shall not alter or change the employment or referral rights of a black applicant because of such individual's failure to achieve a passing grade on the membership examination.

*Union Referral Procedures:*

32. Local 99 shall refer all applicants for employment on a first-in first-out basis. Applicants shall be referred in the order that they appear in the referral register and they shall not be allowed to solicit work on their own from union contractors. This system shall be followed in all cases with the following exceptions:

a. a contractor may call by name a person to fill a foreman's position;

b. a contractor may request a person with special skills, and Local 99 will refer the person with the greatest seniority on the referral register possessing such a skill;

c. a contractor may request a man on the referral register provided that the individual has worked for that contractor within the previous 90 day period. Because black applicants have been denied the opportunity to acquire previous experience with contractors, the proviso contained in sentence one of this subsection shall not apply to black applicants.

d. Each applicant registered on the out of work list shall be required to confirm his continued availability in writing once each month. After two successive months in which an applicant fails to do so his name shall be removed from the list. Applicants who decline three or more referrals (accident, illness, vacation, or bona fide reason otherwise excepted) in a calendar month shall drop to the bottom of the list. An applicant who has been dispatched will be dropped from the list on the sixth working day following his dispatch.

33. All black applicants for construction referral who have a minimum of two years' experience in the sheet metal trade shall have their names placed on the out of work list. "Experience" in the sheet metal trade shall include experience as an employee of a union or nonunion shop, self-employment as a sheet metal contractor, employment as a marine sheet metal worker, or other employment reasonably related to sheet metal work, including experience gained while in the Armed Services. Local 99 shall not require passage of an examination or previous experience under the collective bargaining agreement as prerequisites to the placement of a black applicant's name on the out of work list or his referral to work. An applicant's own statement on an application for referral shall be sufficient evidence as to previous experience. The union shall retain the right to verify any relevant statements made.

*Specific Relief:*

34. Local 99 shall not later than July 15, 1970 contact by certified mail the individuals listed in Exhibit D and those black members and applicants working in nonconstruction classifications and offer them immediate construction referral in response to any of the next three contractor requests for employees following their indication to the union that they desire construction referral. Local 99 shall also explain its membership requirements to such of these individuals who are not members and offer them the

opportunity to apply for admission to membership in the building trades unit.

35. Local 99 shall transmit to the United States copies of all letters sent pursuant to paragraph 34 within three days of sending same and a report detailing the response of the individuals contacted as soon as reasonably possible and whether or not they were referred to work, and if so, when and to which contractor.

## PROVISIONS RELATING ONLY TO ELECTRICAL WORKERS LOCAL 46

*Membership Application Procedures:*

36. Local 46 may require of blacks applying for journeyman wireman membership in the construction unit requirements no more stringent than the following, union constitutions and bylaws notwithstanding:

a. four years of experience in the electrical trade, including experience as an employee of a union or nonunion shop; self-employment as an electrical contractor; employment as a marine electrician; or other employment reasonably related to the electrical trade, including experience gained in the Armed Services;

b. successful completion of the journeyman wireman examination conducted by Local 46;

c. payment of the standard initiation fee for journeyman membership.

As to blacks, the "standard initiation fee" which may be charged shall be no higher than that amount which is the average between the initiation fee charged upon July 2, 1965 and the initiation fee charged upon the effective date of this Order. Payments shall be on the most favorable terms afforded by the local in the past five years.

37. Local 46 shall offer examinations for direct journeyman membership at least once every four months whenever there are applicants for journeyman membership. Each applicant shall be given at least one month's written notice of the date and place of examination, the nature and general description of its

contents and/or copies of the last two thereof, and the names of any texts or other materials which might be particularly helpful in preparing for the examination. Any examination given shall be no more stringent than those given by Local 46 in the past five years.

38. Local 46 shall not alter or change the employment or referral rights of a black applicant because of such individual's failure to achieve a passing grade on the membership examination.

*Journeyman Referral Procedures:*

39. Local 46 shall refer construction electricians to work in the order of priority established in its current collective bargaining agreement. However, the following modifications in the construction work referral system shall be made with regard to black applicants for construction referral:

a. All blacks who have a minimum of two years experience in the electrical trade and are residents within the geographical area constituting the normal construction labor market shall have their names placed on the Group I out of work list. Blacks with less than two years' experience who are residents within the geographic area constituting the normal construction labor market shall be placed on the Group III out of work list.

b. "Experience" as used in paragraph 39a shall include electrical experience as an employee of a union or nonunion shop, self-employment as an electrician or electrical contractor, employment as a marine electrician, or other employment reasonably related to electrical work, including experience gained while in the Armed Services.

c. Local 46 shall not require of black applicants for referral the passage of an examination or previous experience under the collective bargaining agreement as prerequisites to having their name placed on either the Group I or Group III out of work list and being referred to work. In addition, Local 46 shall require no proof of such applicant's prior experience other than his own statement

on an application for referral. The union shall retain, however, all rights to verify any relevant statements therein made.

40. Persons may be referred out irrespective of their positions on the out of work list under those conditions set forth in the current collective bargaining agreement; provided however, that any requirements with respect to previous employment in the electrical trade shall not apply to blacks.

*Special Relief:*

41. Local 46 shall not later than July 15, 1970, contact by certified mail the individuals listed in Exhibit E and offer to place them in Group I for immediate construction referral. Should they so desire, such individuals shall be referred to work in response to any of the next three contractor requests for employees following their indication to the union that they desire construction work referral. Local 46 shall also explain requirements for journeyman wireman membership in the construction unit and shall offer such individuals the opportunity to join as members of Local 46.

42. Local 46 shall transmit to the United States copies of all letters sent pursuant to paragraph 41 within three days after sending same and shall report as soon as reasonably practical the response by the individuals named, including whether or not that were referred to work, and if so, when and to what contractor.

## EFFECTIVE DATE

43. The provisions of this Order shall become effective July 15, 1970.

## EXHIBIT A

1. Urban League
   Smith Tower
   MA 2-2322

2. Multi Services Center
   2319 South Jackson

3. Concentrated Employment Program
   1519—12th

4. Seattle Opportunities Industrialization Center
   2332 East Madison Street
   EA 4-8270

5. Central Area Motivation Program
   722—18th Avenue
   EA 3-2824

6. NAACP
   152½—20th Avenue
   EA 4-6600

7. City of Seattle Human Rights Department
   Seattle Municipal Building
   583-2754

8. Washington State Employment Security Department
   515 Thomas Street
   464-7600

9. Seattle Community College
   1718 Broadway
   587-5454

10. AMCO
    215 Columbia
    MA 2-5060

## EXHIBIT B

William Bracy
2205 S. Ingersoll Place

Cornelius Bradford
945 Empire Way

John Buckner
2715 E. Jefferson

Odell Gilbreath Jr.
12641—64th Avenue South

Melvin Harris
532—23rd Avenue East

Jettie J. Murray
116—29th Avenue

Leonard O'Neale
1414 South Forest

Charles Stewart
513—21st Avenue

## EXHIBIT C

Charles Brewer
407—30th Avenue

Cornelius Bradford
945 Empire Way

EXHIBIT D

John Buckner
2715 East Jefferson

Odell Gilbreath, Jr.
12641—64th Avenue South

Melvin Harris
532—23rd Avenue East

Cornelius Bradford
945 Empire Way

EXHIBIT E

James Johnson
102—25th Avenue

Cornell Huggins
12203—24th

Ester Whitman
526—30th Avenue

Johnnie Gladney
3406 East James St.

Robert Johnson Jr.
1910—19th Avenue So.

Andrew Pegee
2010 E. 35th Street

Willie Crawford
12810 S.E. 29th
Bellevue, Washington

Henry Lee Collins
723—25th Avenue South

William W. Character
3319—37th Avenue South

Frank Alexander
304—28th Avenue South

Charles Alford
2014—32nd Avenue South

Jessie Lee Anderson
1621—25th Avenue

Arthur Pearson
2018 South L Street
Tacoma, Washington

Alvin George
8015 Beacon Avenue South

Tommy Stern
114—24th Avenue East

Harold Wright
111—25th Avenue East

Zaymen Wilkerson
1001—20th Avenue South

Herman Williams
5929—31st Avenue S.W.

Robert Vaughn
1432—24th Avenue

Louis C. Thomas
2030½ E. Madison

John W. Thomas
937—26th Avenue

Joseph Scott
1605—21st

William King
2116—22nd Avenue South

Ernest Marion
5567—17th Avenue South

Cleveland King
1720 East Denny

R. J. Hampton
3306—35th Ave. South

Joshua Gardner
1149—33rd Ave. East

Cliff Evans
2704—22nd Ave. South

Herbert Mitchell
802—33rd Avenue

Samuel Cherry
1307—14th Avenue South

H. E. Stone
701—9th Street S.E.
Auburn, Washington

JUDGMENT AND DECREE NO. 2 REGARDING STANDARDS AND PROCEDURES RELATING TO APPRENTICESHIP AND TRAINING.

1. Defendant Joint Apprenticeship Committees, their officers, agents, employees, successors, and all person in active concert or participation with them in the administration of the apprenticeship programs are permanently enjoined from discriminating against applicants for apprenticeship because of their race or color. All committee programs shall be conducted so as to provide employment opportunities to black applicants and participants which are equal to those provided white applicants and participants.

*Dissemination of Information:*

2. In order to apprise blacks residing within the geographical area served by the respective apprenticeship committees

of the requirements and procedures for admission to the "regular' and "special" apprenticeship programs set out below, each committee shall prepare a brief summary of the requirements for admission and graduation of each program together with a brief description of the employment opportunities available to the apprentices and journeymen. Such statement shall be made available to all apprentice applicants. A copy of such statement, together with a copy of the applicable apprenticeship standards, shall be forwarded to the organizations listed on Exhibit A to this Order and to the vocational guidance counselors at Garfield, Franklin and Cleveland High Schools in Seattle. A copy of this statement or statements shall be furnished to the Plaintiff.

3. Once a month for six months following the entry of this Order, and quarterly thereafter, Defendant Apprenticeship Committees shall place advertisements in newspapers identified with serving the black community, describing the work opportunities available through the "regular" and "special" apprenticeship programs, the requirements and procedures for obtaining such opportunities, the beginning rate of pay for each program and the current journeyman scale, the names of organizations or persons from whom further information may be sought, and a statement that such opportunities are offered on a nondiscriminatory basis. Copies of such advertisements, along with the date of publication and the identity of the newspaper, shall be furnished to the Plaintiff.

4. Defendant Apprenticeship Committees shall also offer to participate in Career Day exercises and similar programs at Garfield, Franklin and Cleveland High Schools in Seattle, and shall contact the high school counselors and placement officers at these high schools as well as officials of the organizations listed in Exhibit A, and advise these persons of the nature of and the requirements for the "regular" apprenticeship programs. Each committee shall also furnish such high schools and organiza-tions with apprentice application forms for the "regular" apprenticeship program along with instructions that an applicant can complete it and mail it to the apprenticeship committee. On receipt of a mailed application form, an apprenticeship committee shall promptly send to the applicant (by return mail if practicable) written acknowledgment and instructions as to what further steps the applicant must take to complete his application.

*Qualification Requirements for Regular Apprenticeship Programs:*

5. The Plumbers and Pipe Fitters J.A.T.C. and the Sheet Metal J.A.T.C. shall maintain a list of qualified apprentice applicants and shall consider qualified all persons meeting the following standards:

a. Age: between 18 and 25.

b. Education: high school graduate or the equivalent, i. e., a GED; and providing a high school transcript.

c. Health: no disabling physical defects for work at this trade.

d. Tests: passing score on the GATB aptitude test administered by the Washington State Division of Employment Security.

6. Defendant Ironworkers J.A.C. shall maintain a list of qualified apprentice applicants and shall consider qualified all persons who meet the following standards:

a. Age: between 18 and 30.

b. Education: completion of ten years of school and providing a high school transcript.

c. Health: no disabling physical defects for work at this trade.

d. Residency: a resident in the jurisdiction of Local 86 for one year prior to application except for veterans who apply within 90 days of discharge.

e. Tests: passing score on the GATB aptitude test administered by the Washington State Division of Employment Security.

There shall be no bases of qualification, disqualification, or priority other than those standards herein stated.

*Affirmative Action: Regular Apprentice Program:*

7. Defendant Apprenticeship Committees shall select and indenture a sufficient number of black applicants for apprenticeship to insure a reasonable level of participation sufficient to overcome the present effects of past discrimination. To assist Defendants in accomplishing this objective the Court sets forth the following guidelines:

a. The Plumbers and Pipe Fitters J.A.T.C. and the Sheet Metal Workers J.A.T.C. can accomplish a reasonable level of participation by selecting, to the extent there are blacks on the list of qualified apprentice applicants, a sufficient number of blacks so as to insure a minimum participation by blacks in the building trades' apprenticeship programs of 30 percent of each class, or seven new apprentices per respective J.A.T.C. per year, whichever is greater.

b. The Ironworkers J.A.T.C. can accomplish a reasonable level of participation by selecting, to the extent there are blacks on the list of qualified apprentice applicants, a sufficient number of blacks so as to insure a minimum participation by blacks in its apprenticeship program of 30 percent of each class, or six new apprentices per year, whichever is greater.

For the purpose of the guidelines presented in this paragraph, the phrase "minimum participation of blacks" refers to participation both in the class of persons entering the apprentice program and the class of persons remaining in the program for more than three months. Blacks whose apprenticeships terminate in three months or less shall be replaced with newly indentured black apprentices to insure the required participation by blacks.

c. In order that opportunities for apprenticeships may be generally available, Defendant Contractors Associations shall use all possible means to provide as many apprenticeship positions as required to afford blacks a reasonable level of participation in the apprenticeship programs.

*Affirmative Action: Training and Special Apprenticeship Programs:*

8. Within 60 days from the entry of this Decree, Defendant Apprenticeship Committees shall develop and implement special apprenticeship programs emphasizing on the job training to meet the special needs of the following groups: overage black applicants with no previous experience or special skills in the trade; any black applicant of apprenticeable age or older who has some previous experience or special skills in the trade but does not meet journeyman standards. The foregoing programs shall be developed and implemented in consultation with the Advisory Committee hereinafter provided for.

a. Persons meeting the following criteria shall be considered qualified to enter the special apprenticeship programs:

Age: above the present apprenticeship age in each trade and below the age of 45. (This criteria should not apply to the second group of black applicants described above who are semi-skilled.)

Health: no disabling physical defects for work at the trade.

Recommendations: Providing a letter of recommendation from the Special Advisory Committee described in subparagraph *l* and m, below, or from any organizations or individuals said Advisory Committee may designate for the purpose of giving letters of recommendation.

b. The Defendant Apprentice Committees may draw up reasonable standards in consultation with the Advisory Committee hereinafter provided for which participants must meet for continued participation in the special programs. The continuing acceptability of a participant's work to his contractor employer shall be considered a most important factor in determining whether the participant is making satisfactory progress and whether the criteria set up for

continuing participation in the program are reasonable.

c. Each apprenticeship committee may impose reasonable limitations upon the size of its special apprenticeship class. Should the Plumbers and Pipe Fitters J.A.T.C. decide to set a ceiling, it should set that ceiling at such a level that it may reasonably anticipate an annual graduation class of at least 25 persons. Likewise, the Ironworkers J.A.C. and the Sheet Metal Workers J.A.T.C. should set their ceilings at such a level that they may reasonably anticipate annual graduation classes of at least 20 persons. In the event that the Electrical Workers J.A.T.C. becomes a participant in this action, it should set its ceiling at such a level that it could reasonably anticipate annual graduation classes of at least 25 persons.

d. The special program which the Plumber and Pipe Fitter Apprenticeship Committee prepares shall be designed to graduate special apprentices as journeymen after they have participated in the program for a period of three years or whatever lesser time the committee determines to be reasonably feasible. The ironworkers program shall require 3,000 hours or two years or less, and the sheet metal program shall require two years or less, and any special apprenticeship program developed by the Electrical Workers J.A.T.C. shall require two years or less.

e. The rates of compensation for special apprentices shall be the same as the rates of compensation for normal apprentices.

f. When special apprentices are assigned onto a construction job they shall be in addition to, and not in lieu of, any employees or normal apprentices already on the payroll or who would normally be employed. They shall perform such work as has customarily been performed by apprentices in the particular craft during the past five years.

g. Pending the development and implementation of these programs by the apprenticeship committees, contractors with whom each union has a collective bargaining agreement shall establish and maintain a preapprentice program for blacks, notwithstanding any provisions in the collective bargaining agreements to the contrary. Defendant Locals shall cooperate in good faith with the contractors to insure that all such preapprentices receive on the job training of the nature customarily provided apprentices. Special preapprentices shall be compensated at rates equivalent to those paid regular apprentices.

Such preapprentices shall be in addition to and not in lieu of any employees or apprentices already on the payroll or who would normally be employed and shall perform such work as has customarily been performed by regular apprentices in the particular craft during the past five years.

h. Contractors with whom Local 86 has collective bargaining agreements shall establish, maintain, and make all good faith efforts to fill 20 preapprentice positions. Contractors with whom Local 32 has collective bargaining agreements shall establish, maintain and make all good faith efforts to fill 25 positions. Contractors with whom Local 99 has collective bargaining agreements shall establish, maintain and make all good faith efforts to fill 20 positions, and contractors with whom Local 46 has collective bargaining agreements shall establish, maintain and make all good faith efforts to fill 25 positions.

i. Two months from entry of this order Defendant Locals shall transmit to plaintiff United States the following data: name, address, telephone number, wage scale, hours worked and employers of each black preapprentice employed in its craft during the previous two months. If any preapprentice leaves the program, or is dismissed from it, Defendant Locals shall submit a report to the plaintiff United States within ten days describing the reasons the preapprentice left the program and the steps taken by the Defendant Local to see that he remained in the program. Plaintiff shall review this data and submit to the Court with copies

transmitted to the interested local a synopsis of the data and explanations therein contained along with any comments Plaintiff might wish to make.

j. Defendant Locals shall permit the contractors to replace any dropouts or terminations with new preapprentices so that the special preapprentice positions may be filled at all times.

k. When the special apprenticeship programs are finally developed and implemented by Defendant Apprentice Committees, the preapprentice program established by the contractors pursuant to subparagraph g of this Decree shall be superseded and all participating preapprentices shall be eligible to enter into the special apprenticeship program. The joint apprenticeship committees shall contact by mail all black preapprentices who have participated in the preapprenticeship programs, describing the special apprenticeship programs and inviting each preapprentice to participate. Copies of these letters and any responses thereto shall be promptly forwarded to Plaintiff.

l. An Advisory Committee of nine members shall be established, two each from Labor, the Contractors' Associations, the black community, and the interested owners in. this Court's cause numbers 8533, 8552 and 8566, namely, the State of Washington, King County and the Port of Seattle. The ninth member shall be a person from some minority group other than black. The black and minority representatives shall be appointed by such representative groups as designated by the Executive Director of the Washington State Board Against Discrimination. The two owner representatives shall be jointly appointed by the owner organizations mentioned above. All representatives shall be designated on or before July 7, 1970. Upon such designation, the Court shall be promptly advised thereof. The Advisory Committee may select a Chairman, Executive Board or any other internal organization device it deems appropriate to facilitate the accomplishment of its duties.

Funds required to defray the expenses incurred by the Advisory Committee shall be contributed equally by Defendant Unions and Defendant Contractor Associations until and to such extent that governmental or private funding, or some combination thereof, may be made available. Members of the Advisory Committee shall serve without compensation, provided, however, that the committee shall have the right to hire and compensate such staff as necessary to accomplish its purposes.

m. The Advisory Committee shall have the following responsibilities:

(i) Communication and interpretation within the black and other minority communities and within their respective constituencies of the contents of this Order, along with information regarding the steps and general progress being accomplished in its implementation;

(ii) Cooperation and consultation with the appropriate apprenticeship committee, union and contractor organizations in attempting to formulate new or altered apprenticeship training programs;

(iii) When the special apprenticeship programs are finally drawn up by the apprenticeship committees, the Advisory Committee shall submit a report to the Court expressing its views thereon;

(iv) The committee shall issue the letters of recommendation provided for in subparagraph a, above, to persons who are likely to successfully complete the special apprenticeship training programs. The committee shall also have the power to designate other persons or organizations for the purpose of issuing such letters;

(v) Conciliation.

*Records and Record Keeping:*

9. Each joint apprenticeship committee shall maintain complete records of all

applications and other material concerned with the selection and work records of both regular and special apprentices for the life of this Decree. These records shall include a serially numbered bound apprentice applicant log for each program showing the name, race and date of birth of each applicant, and dates of completion of each step in the application procedure and disposition of each application. All such records shall be made available for inspection and copying by plaintiff United States at reasonable intervals during normal working hours or at other mutually convenient times.

10. Defendant Apprenticeship Committees shall submit to this Court and to the plaintiff United States each four months for the life of this Decree a report detailing the efforts taken in compliance with the provisions of this Order, including copies of all correspondence and advertisements. The report shall state the number of persons who filed applications during that period, the names, addresses and telephone numbers of all black applicants. It shall also state the number of applicants by race, who have been selected as apprentices for the regular program. For any black applicant who is rejected or whose application becomes inactive during the reporting period, the report shall state the reasons therefor. For each black apprentice, the report shall indicate which program, regular or special, that he is participating in, shall show his work history during the reporting period, including the date of each referral, the name of each contractor to whom he was referred, and the number of hours worked as reflected by Health and Welfare reports for each contractor during the reporting period.

11. During the life of this Decree, if any black apprentice drops or is dropped from the "regular" or "special" apprenticeship programs described in paragraphs 7 and 8 of this Order, the applicable apprenticeship coordinator shall submit a report within ten days to the plaintiff United States stating the reason why the individual left the program and any steps taken by the committee to retain the individual in the program. The report shall also include the school and employment history of the individual while he was in the program, including the names of the contractors by whom he was employed.

*Retention of Jurisdiction:*

12. The Court shall retain jurisdiction of this case for such further relief as may be necessary or appropriate to further effectuate equal employment opportunities. At any time after June 30, 1973, any defendant affected by this Order pertaining to training and apprenticeship programs may move this Court, on due notice, for termination of this Order or such modification as may be warranted under the circumstances then existing.

*Costs:*

13. Since the application of this Order is substantially prospective, the matter of costs is reserved and may be brought on with such motions as might be made under paragraph 12, above, or at such other time as may be considered appropriate.

### PROVISIONS RELATING ONLY TO IRONWORKERS J.A.C.

14. The J.A.C. shall discontinue the use of the Flanagan Aptitude Test in all future screening of apprentice applicants. It may substitute the GATB aptitude test in which event such tests shall be by the Washington State Division of Employment Security.

15. Defendant J.A.C. shall contact the following black apprenticeship applicants by certified mail before July 15, 1970, explaining the requirements and procedures and offering them referral as regular or special apprentices—as their qualifications may dictate—in the first available apprenticeship class: Gregory Buford, James Cherry, William Fair, Leslie Johnson, Joseph Lyles and Errin Webb.

If the J.A.C. has not formulated its special apprenticeship program by July

15, 1970, it shall at least explain the classes of persons that qualify for the program, the type of training contemplated and the estimated time it will take an apprentice to graduate from the program.

### PROVISIONS RELATING ONLY TO SHEET METAL WORKERS J.A.T.C.

16. Applications for apprenticeship shall be made available at all times during the normal business hours of the union and J.A.T.C. offices. In addition, the J.A.T.C. shall cease the practice of periodically closing the books to new applicants. Applications shall be continuously received by the J.A.T.C. even though the backlog of applicants is greater than the number of apprentice positions open.

17. Defendant J.A.T.C. shall contact the following black apprenticeship applicants by certified mail before July 15, 1970, explaining the requirements and procedures of both the special and regular apprenticeship programs and offering them referral as regular or special apprentices—as their qualifications may dictate—in the first available apprenticeship class: Michael Ashley, Bruce Bibb, Willie Frazier, Robert L. Haddix, Anthony Robinson, Willie Thomas.

### PROVISIONS RELATING ONLY TO PLUMBERS AND PIPE FITTERS J.A.T.C.

18. Defendant J.A.T.C. shall contact Ray Fairman and Roy Lawson by certified mail before July 15, 1970, explaining the requirements and procedures of both the special and regular apprenticeship programs and offering them referral as regular or special apprentices—as their qualifications may dictate—in the first available apprenticeship class. Applications for the regular construction apprenticeship program shall also be forwarded to each indentured black marine apprentice. Appropriate credit shall be given marine apprentices desiring to transfer to construction work for shipyard training experience, and the inden-

tured black marine apprentices shall be advised of this fact.

### PROVISIONS RELATING TO TRAINING IN THE ELECTRICAL TRADE

19. Local 46, Defendant Contractors' Associations and plaintiff United States shall forthwith take all steps available to them to persuade or require the Electrical Workers J.A.T.C. to intervene in this case as a party defendant for purposes of relief in respect to the operation of a special apprenticeship program similar to those described above. In entering this provision the Court does not intend to find nor imply that the Electrical Workers J.A.T.C. has discriminated against blacks, but enters same in an attempt to establish uniformity in procedures relative to the J.A.T.C.'s connected with the respective defendant unions found to have discriminated.

Until such time as the Electrical Workers J.A.T.C. shall become a party, the following program of affirmative action shall be employed in the electrical industry.

a. Local 46 shall permit contractors with whom it has collective bargaining agreements to establish and maintain 25 new positions each year for black trainees notwithstanding any provisions in the collective bargaining agreement to the contrary. Local 46 shall aid the employers in filling such positions and shall cooperate with them to insure that all such trainees receive on-the-job training of the nature customarily provided apprentices. Trainees shall be compensated at apprentice rates. A trainee who acquires two years of experience in a trainee position shall be paid at full journeyman's rates.

b. Every three months Local 46 shall transmit to plaintiff United States data showing the name, address, telephone number, wage scale, hours worked and employers of each black trainee employed during the previous three month period. If any black trainee leaves the program, or is dismissed from it, Local 46 shall

submit a report to the plaintiff United States within ten days describing the reasons the trainee left the program and the steps taken by Local 46 to see that the trainee remained in the program. In addition Local 46 shall permit the contractors to replace any dropouts or terminations with new trainees, so that the trainee positions may be filled at all times.

## EFFECTIVE DATE

20. Except as otherwise provided, the provisions contained in paragraphs 8 and 19 shall become effective upon the filing of this Order. All other provisions, except as otherwise provided, shall become effective July 15, 1970.

## EXHIBIT A

1. Urban League
   Smith Tower
   MA 2–2322

2. Multi Services Center
   2319 South Jackson

3. Concentrated Employment Program
   1519—12th

4. Seattle Opportunities Industrialization Center
   2332 East Madison Street
   EA 4–8270

5. Central Area Motivation Program
   722—18th Avenue
   EA 3–2824

6. NAACP
   152½—20th Avenue
   EA 4–6600

7. City of Seattle Human Rights Department
   Seattle Municipal Building
   583–2754

8. Washington State Employment Security Department
   515 Thomas Street
   464–7600

9. Seattle Community College
   1718 Broadway
   587–5454

10. AMCO
    215 Columbia
    MA 2–5060